```
 1                     UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
 2                           MIAMI DIVISION
                       CASE NO. 18-CR-20685-KMW-5
 3

 4     UNITED STATES OF AMERICA,           Miami, Florida

 5                                         February 8, 2021
                vs.
 6                                         10:00 a.m. - 4:32 p.m.

 7     GUSTAVO ADOLFO HERNANDEZ FRIERI,

 8              Defendant.                 Pages 1 to 105

 9     _____

10        TRANSCRIPT OF PRE-SENTENCING HEARING ON FINANCIAL MATTERS
                             VIA VIDEOCONFERENCE
11                  BEFORE THE HONORABLE EDWIN G. TORRES
                       UNITED STATES MAGISTRATE JUDGE
12
       APPEARANCES:
13

14     FOR THE GOVERNMENT:        KURT K. LUNKENHEIMER
                                  NALINA SOMBUNTHAM
15                                ASSISTANT UNITED STATES ATTORNEYS
                                  UNITED STATES ATTORNEY'S OFFICE
16                                99 NE 4th Street
                                  Miami, Florida 33132
17
                                  PAUL A. HAYDEN
18                                ASSISTANT UNITED STATES ATTORNEY
                                  UNITED STATES DEPARTMENT OF JUSTICE
19                                Criminal Division - Fraud Section
                                  1400 New York Avenue NW
20                                Washington, D.C. 20005

21     STENOGRAPHICALLY REPORTED BY:

22                                ILONA LUPOWITZ, CRR, RPR, RMR
                                  Official Court Reporter
23                                United States District Court
                                  400 North Miami Avenue
24                                8th Floor
                                  Miami, Florida 33128
25                                (305) 523-5634
```

2

```
 1   FOR THE DEFENDANT:        MICHAEL S. PASANO, ESQ.
                               CARLTON, FIELDS, JORDEN & BURT, P.A.
 2                             100 SE 2nd Street
                               Suite 4000
 3                             Miami, Florida 33131

 4   FOR THE WITNESS, ALLISON  SAMUEL J. RABIN, JR., ESQ.
     DOMENEGHETTI:             800 Brickell Avenue
 5                             Suite 140
                               Miami, Florida 33131
 6
     FOR THE WITNESS, OLYMPIA  GUY RASCO, ESQ.
 7   DE CASTRO:                DEVINE, GOODMAN & RASCO, LLP
                               2800 Ponce de Leon Boulevard
 8                             Suite 1400
                               Coral Gables, Florida 33134
 9
                               MARGOT MOSS, ESQ.
10                             DAVID MARCUS, ESQ.
                               MARGO/MOSS, PLLC
11                             40 NW 3rd Street, PH 1
                               Miami, Florida 33128
12
     FOR THE WITNESS,          JAMES R. GAILEY, ESQ.
13   DANIEL M. HOLTZ:          100 Biscayne Boulevard
                               Suite 1114
14                             Miami, Florida 33132

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Call to the Order of the Court at 10:00 a.m.)

 2         THE COURTROOM DEPUTY:  The United States District Court

 3    for the Southern District of Florida is now in session; the

 4    Honorable Edwin G. Torres presiding.  Calling case, United

 5    States versus Gustavo Adolfo Hernandez Frieri, case number

 6    18-20685, criminal, Judge Williams.

 7         Counsel, please state your appearances for the record.

 8         MR. LUNKENHEIMER:  Good morning, Your Honor.  Kurt

 9    Lunkenheimer on behalf of the United States, and with me, via

10    Zoom, is fellow AUSA, Nalina Sombuntham, and DOJ trial

11    attorney, Paul Hayden.  We may have one of our case agents, HSI

12    Special Agent Alan Vega joining in.  I think he was having some

13    troubles, but he might be joining later.

14         THE COURT:  Good morning.

15         MR. PASANO:  Good morning.  This is Mike Pasano.  I am

16    here with my client, somewhere on this Zoom call,

17    Mr. Hernandez.

18         THE COURT:  Good morning.

19         Who else is making an appearance for the purposes of

20    the record other than just attending?

21         MR. RABIN:  My name is Sam Rabin.  I'm here on behalf

22    of a witness, Allison Domeneghetti.  Ms. Domeneghetti is also

23    on here, although I anticipate that as soon as court begins, we

24    will be able to excuse her pursuant to an agreement I have with

25    the government.
```

1           THE COURT:  Okay.

2           MS. MOSS:  Good morning, Your Honor.  Margot Moss and

3    David Markus on behalf of Olympia De Castro, who is also

4    present on the Zoom hearing.  Good morning.

5           THE COURT:  Good morning.

6           MR. RASCO:  Good morning, Judge.  Guy Rasco here, also

7    on behalf of Olympia De Castro.

8           THE COURT:  Anybody else making an appearance other

9    than just attending?

10           MR. LUNKENHEIMER:  Your Honor, I believe Jim Gailey is

11    representing our first witness, Daniel Holtz, who -- I see he's

12    on there, but that -- I believe everybody else is just

13    attending.

14           THE COURT:  Okay.  I don't see Mr. Gailey, but maybe

15    he's with Mr. Holtz.

16           MR. LUNKENHEIMER:  No, I see a square.

17           THE PROBATION OFFICER:  I'm not sure if I was supposed

18    to make an appearance.  This is Vanessa Pulido on behalf of

19    probation.

20           THE COURT:  Okay.  Good morning, everybody.  This

21    hearing was referred to me by Judge Williams, as I believe.

22    Thank you all for your appearances.

23           Before we begin, let me get a couple of housekeeping

24    matters in order.  I'm going to try to expedite the processing

25    of the witnesses this morning, and then we may not finish, in

1   which case we'll reset it for additional witnesses and oral

2   arguments.

3          Let me -- Mr. Lunkenheimer, you wanted to -- I believe

4   Ms. Rabin mentioned that there might be an agreement on a

5   witness.  Maybe we can get to that so we can let some people

6   off.

7          MR. LUNKENHEIMER:  Yes, Your Honor.  Mr. Rabin, I

8   believe, was retained officially last Thursday to represent

9   witness, Allison Domeneghetti, who was served by subpoena the

10  previous weekend.  As soon as -- that was as soon as we could

11  serve her as the hearing date has been moved around a little

12  bit, as you know.  So Mr. Rabin called me, and he just said

13  that in this short of a time frame, he did not think he could

14  properly prepare her to testify pursuant to his obligations.

15  He did produce documents this weekend in response to the

16  hearing subpoena that we sent to him, and we appreciate that,

17  but I had told him we were going to call Ms. Domeneghetti as

18  our third witness.

19         So, one, I think with the time frame we're looking at

20  today, I don't think we would get to her anyway, but we also

21  thought it would be fair to Mr. Rabin and to Ms. Domeneghetti

22  to give them more time to properly prepare for her testimony.

23  So we agree that we would not, you know, make them go today,

24  put her on the stand today.

25         THE COURT:  That's your understanding, Mr. Rabin?

1          MR. RABIN:  Judge, that's my understanding.  We had

2    also discussed the possibility of her submitting to a voluntary

3    interview, in lieu of having to testify, as another

4    possibility.  So, basically, I'm going to ask that she be

5    excused with the possibility of being recalled on another day,

6    but, in the interim, maybe the government and I can work

7    something out where she can satisfy her obligations in an

8    interview.

9          THE COURT:  Very well.  With that agreement, then I'll

10   -- thank you, Ms. Domeneghetti, for complying with your

11   subpoena.  You will not be called today.  The matter will be

12   reset, if necessary, for a future date.  And you'll hear from

13   Mr. Rabin.

14         Thank you, Mr. Rabin.  Congratulations, by the way.

15         MR. RABIN:  Thank you very much, Judge.  Allison, you

16   can log off.  I'm going to stay on, but you can log off.

17         (Discussion was held off the record.)

18         THE COURT:  All right.  Let me turn to

19   Mr. Lunkenheimer.  Tell me, very briefly, what -- not in an

20   argument, but your roadmap of what it is that you want to

21   accomplish this morning and what finding you think I will

22   therefore make from the -- let's start with the first witness.

23         MR. LUNKENHEIMER:  Yes, Your Honor.  I don't know, Your

24   Honor, if we will be requesting any finding be made.

25         The first witness is going to be Daniel Holtz, who was

1    a -- I guess a business partner/co-investor with Mr. Gustavo

2    Hernandez in some ventures they had that have been discussed in

3    some of -- the forfeiture order and some of the documents that

4    we've seen.  Basically, Your Honor, we asked Judge Williams --

5    we had a joint status conference with Mr. Pasano and my

6    co-counsel, and I think Mr. Ben Curtis was also attending on

7    behalf of Mr. Hernandez.  Instead of having these witnesses

8    testify at the sentencing hearing to resolve some issues that

9    the government had with some documents and some information we

10   were learning about, we thought it would be best that it would

11   be referred to you to take the testimony, as they will overlap

12   -- the testimony would overlap with the third party ancillary

13   proceedings, which I think have been referred to you by Judge

14   Williams, after the sentencing takes place, concerning versus

15   assets.

16           Your Honor, in a nutshell, as I think you know from

17   this case, it's a money-laundering conspiracy in which

18   Mr. Hernandez was a part of, and he had admitted to partaking

19   in laundering $12,000,000 of elicited proceeds, and we are just

20   trying to find out what assets would be potentially directly

21   forfeitable assets and what assets would be substitute assets

22   for any forfeiture amount that is entered against him by the

23   Court at sentencing.  And as we keep progressing towards

24   sentencing, we keep learning more information, and we're not

25   necessarily getting straight answers, so we thought it would be

1    best to take this testimony to get those answers and give us a

2    path as to forfeitable assets, substitute assets, whether the

3    defendant has been cooperating as to forfeiture and -- you

4    know, overall we think it bears on the sentencing -- the

5    3553(a) factors as it relates to him.  And that's why we are

6    here today, and we would expect to call Mr. Holtz first.  I

7    don't know how -- exactly how long it would take.  I don't

8    think it would take too long.  And then we would call Ms.

9    Olympia De Castro, the ex-wife of the defendant.

10           MR. PASANO:  Judge, this is Mr. Pasano.  May I just

11   briefly comment?

12           THE COURT:  Sure, briefly.

13           MR. PASANO:  Your Honor, so -- just to put this in

14   context -- so Mr. Hernandez agreed with the government to this

15   hearing.  He's not objected to it.  As the Court's aware from

16   my prior filings, Mr. Hernandez consistently has said he does

17   not own the things that the government is concerned about and,

18   thus, we don't intend to be adversarial here.  As the Court has

19   pointed out, third parties will come into deal with those

20   issues.  One property is the house.  There's already a claim

21   made, and that will be resolved by Mr. Castro's lawyers and the

22   Court.

23           The second relates to a settlement with Mr. Holtz for

24   $900,000.  There's a -- the government has filed for forfeiture

25   on that as a substitute asset, and the claim will be filed, I

1    understand, sometime this week with regard to that asset.

2         And, then, the third asset roughly relates to property

3    in New York and the company called IWC.  That is not, at this

4    point, formally moved on by the government, but they signed a

5    protective order with regard to related property while they

6    sort out whether or not Mr. Hernandez has any ownership

7    interest.  And we continue to look at dates.  All of those

8    properties I mentioned were acquired well before the alleged

9    criminal conduct to which -- no longer alleged.  Mr. Hernandez

10   pled guilty.  So it's not really direct forfeiture, but the

11   government has a right to make sure of that.  The real question

12   is substitute as to forfeiture, or for purposes of fine, or

13   otherwise, you know, whether Mr. Hernandez owns any of these

14   assets that the government's kind of wondering about.

15        We offered Mr. Hernandez, as Sam Rabin did with his

16   client, to the government to be interviewed.  The government,

17   when they mentioned straight answers -- we're not going to

18   fight with them.  We're just trying to resolve and straighten

19   out whatever answers they need without (indiscernible).

20        Your Honor, thank you for indulging.

21        THE COURT:  Okay, very well.

22        Well, then, with that understanding then,

23   Mr. Lunkenheimer, you're going to call Mr. Holtz first?

24        MR. LUNKENHEIMER:  Yes.  And, Your Honor, I guess Ms.

25   Sombuntham will be doing the questioning of Mr. Holtz.  I think

1    pursuant to an agreement reached via email, Mr. Pasano does not

2    object to admission of all the 21 exhibits we have filed on the

3    docket to help, you know, proceed and move this along.

4              MR. PASANO:  Correct, Your Honor.

5              THE COURT:  All right.

6              MR. LUNKENHEIMER:  So we will move all 21 exhibits into

7    evidence at this time.

8              THE COURT:  Government's 1 through 21 will be admitted

9    for purposes of the hearing.

10            (Government Exhibits 1 through 21 were received in

11          evidence.)

12            THE COURT:  Maedon, go ahead and swear in Mr. Holtz.

13    You're muted, Maedon.

14            THE COURTROOM DEPUTY:  I'm sorry.

15            Mr. Holtz, please raise your right hand.

16            (Government witness, DANIEL M. HOLTZ, duly sworn.)

17            THE COURTROOM DEPUTY:  Please state and spell your name

18    for the record.

19            THE WITNESS:  Daniel Martin Holtz, H-O-L-T-Z.

20            THE COURTROOM DEPUTY:  Thank you.

21            THE COURT:  Thank you, Maedon.

22            Mr. Holtz, just for housekeeping purposes, make sure

23    you let the questioner finish the question because there's a

24    delay, even on a Zoom.  So that way, for purposes of our

25    record, make sure you don't talk over the questioning lawyer.

1    Okay?

2         THE WITNESS:  Thank you, Judge.

3         THE COURT:  Thank you.

4         Go ahead, Counsel.

5                   DIRECT EXAMINATION

6    BY MS. SONBUNTHAM:

7    Q.  Good morning, Mr. Holtz.  Can you hear me?

8    A.  I can.

9    Q.  Great.

10       Mr. Holtz, how are you employed?

11   A.  I am currently employed by a company that I own called

12   Walden Capital Corporation.

13   Q.  And in that corporation or other businesses, did you ever

14   work with the defendant in this case, Gustavo Hernandez Frieri?

15   A.  Yes.

16   Q.  And how did you come to meet Mr. -- the defendant, Gustavo

17   Frieri -- Hernandez Frieri?

18   A.  He and I met at first socially, prior to 2002, but I don't

19   recall the specific date.

20   Q.  And, then, how did you come to work with the defendant?

21   A.  I believe the first business that we were engaged in

22   together was an investment -- involved an investment that he

23   made into a company that I was raising money for in Q four of

24   2002, which was a proposed cruise line by the name of Oceania,

25   O-C-E-A-N-I-A.

1  Q.  And did you work or partner with him in other ventures, for

2  example, Italian Wine Merchants, also called IWM?

3  A.  Yes.

4  Q.  And what is IWM?

5  A.  IWM, or better referred to as Italian Wine Merchants, was a

6  retailer of fine wines in New York City.

7  Q.  And how did you work with the defendant in IWM?

8  A.  Myself and two other partners acquired approximately

9  60-percent stake in IWM sometime in 2007, thereabouts.

10  Q.  And how did you invest in IWM?

11  A.  We each made a cash investment directly into Italian Wine

12  Merchants.

13  Q.  And do you know a company called Salondera, LLC, spelled

14  S-A-L-O-N-D-E-R-A?

15  A.  Yes.

16  Q.  And what is that company?

17  A.  Salondera was essentially the holding company through which

18  we made that investment.

19  Q.  And you referred to "we."  Who is "we?"

20  A.  Myself, Gustavo Hernandez and Jorge Mora.

21  Q.  And through Salondera, LLC, what roles did you, the

22  defendant, Gustavo Hernandez Frieri, and Jorge Mora play in

23  IWM?

24  A.  As I recall, we served as directors of Italian Wine

25  Merchants.

1    Q.   And did your wife, Toni Holtz, participate in any of the

2    activities that you did for IWM?

3    A.   No.  At some point -- and I believe it was 2015 -- the

4    three of us, that is, myself, Gustavo Hernandez and Jorge Mora,

5    transferred our interest in Salondera to our spouses -- in the

6    case of Jorge Mora, to his brother -- and I believe that was in

7    2015.

8    Q.   Mr. Holtz, I'm going to try and share my screen to show you

9    government's exhibit 1.

10        Mr. Holtz, do you see government exhibit 1?

11   A.   Yes, I do.

12   Q.   And I'm going to scroll through quickly.

13        What is government exhibit 1?

14   A.   I have not been able to reread it, but I believe it's

15   communication between myself and Gustavo Hernandez.

16   Q.   And I'm on page 9, the bottom of page 9 in government

17   exhibit 1.

18        This email correspondence, what date is this email?  I

19   think it's the first email in the chain, just so everyone can

20   see.

21   A.   The one you were just referring to, I believe, was October

22   of 2018.

23   Q.   And who is this email from, again?

24   A.   It is from Gustavo, I believe, to me.

25   Q.   And that's the defendant in this case?

1    A.   That is correct.

2    Q.   And at the time this email was sent, what is your

3    understanding of where the defendant was?

4    A.   I -- well, I don't recall when he was -- when he reentered

5    the United States, because I do know he spent a considerable

6    amount of time in Italy, but, during this period of time, he

7    may have already come back to the U.S.

8    Q.   Do you know why he was in Italy?

9    A.   I believe he was detained or arrested there.

10   Q.   And he was in Italy initially for what reason; do you

11   recall?

12   A.   I believe he and his family were there on a family holiday,

13   and, then, during that holiday --

14        THE COURT:  Mr. Holtz, do you mind repeating your

15   answer because -- I believe we had an internet break-up.  Can

16   you repeat your answer?

17        THE WITNESS:  Yes.  I believe Gustavo Hernandez and his

18   family were in Italy for a family holiday, and during the time

19   that they were there, he was detained or arrested.

20   BY MS. SONBUNTHAM:

21   Q.   And, Mr. Holtz, do you remember why the defendant sent you

22   this email?  I can help -- scroll, if that is helpful to you,

23   through the email.

24   A.   I would appreciate it if you would do that.

25   Q.   Just let me know if I am going too quickly.

```
 1    A.   Go ahead.

 2         I recall this email.

 3    Q.   Starting on page 11 of government exhibit 12 [sic], and for

 4    the record, can you read aloud when it starts here with this

 5    line beginning, "you told me?"

 6              THE COURT:   Counsel, I thought you referred to this as

 7    exhibit 1.   Is it now exhibit 12?

 8              MR. LUNKENHEIMER:   No, it's government exhibit 1 and

 9    it's page 11.   My apologies.

10              THE COURT:   Okay.

11              THE WITNESS:   You told me last year you needed time to

12    pay me the 900 K for my share of the IWM monies you received,

13    and I had no problem since I had no need for the monies, and I

14    was glad to be of help for you.

15         Do you want me to keep reading?

16    BY MS. SONBUNTHAM:

17    Q.   Yes.

18    A.   From our exchanges earlier this year, you told me --

19              THE COURT:   Hold on, hold on.

20         Counsel, do we need to have him read an exhibit that's

21    in evidence?

22              MS. SONBUNTHAM:   No, Your Honor.   If you wanted to, I

23    could just go right into the questions about the -- if everyone

24    -- I guess that's where --

25              THE COURT:   Go ahead.
```

1   BY MS. SONBUNTHAM:

2   Q.   Mr. Holtz, let's unpack this email.   When the defendant

3   refers to 900 K for his share of IWM monies that you received,

4   what is he discussing here?

5   A.   We had sold our stake in IWM back to the company, and we

6   had received approximately 2.7 million for our investment in

7   Italian Wine Merchants, so his pro-rata share, as a one-third

8   owner, our stake, would have been approximately $900,000.

9        At the closing of the sale, all of the proceeds were wired

10  to Walden.   Jorge Mora had requested his share, and his share

11  was wired to him.   Gustavo Hernandez, had not requested his

12  share of the share proceeds.

13  Q.   And just to remind us, what is Walden?

14  A.   Walden is the -- is my employer and my family holding

15  company.

16  Q.   And is there a business relationship between Salondera and

17  Walden?

18  A.   There wasn't one up until we all had the escrow agent for

19  the sale of our IWM stake wire a hundred percent of the

20  proceeds to Walden, and, in turn, Walden was to have divided

21  that and sent each investor their pro-rata share.

22  Q.   And why was Walden used and not Salondera's bank account,

23  or some other means, to pay the investors directly?

24  A.   I suspect that of the three of us, I was in the best

25  position to essentially receive the wire and, in turn, make the

1    appropriate distributions.

2              THE COURT:  Mr. Holtz, when was that distribution made?

3              THE WITNESS:  I believe that Jorge Mora's distributions

4    were in early 2019.  I'm sorry.  Were early -- post closing,

5    and Gustavo had not received his share.

6    BY MS. SONBUNTHAM:

7    Q.  Mr. Holtz, turning back to page 11 of government exhibit 1,

8    the defendant, Gustavo Hernandez, mentioned, quote, "selling

9    Dania."  What is he referring to?

10   A.  Walden owns a 50-percent interest in a mobile home park in

11   Dania Beach, Florida.

12   Q.  And why does he reference it here in this email?

13   A.  In this email, he indicates that as a result of the need to

14   pay lawyers to prepare for his defense, he would like to get

15   all or a portion of the 900,000 that Walden owed him.

16   Q.  Mr. Holtz, before moving from government exhibit 1, I'm

17   going to scroll to the first -- I'm sorry -- last email in the

18   email chain.

19       Can you first tell us what the date of that email is?

20   A.  November 27, 2018.

21   Q.  And after this email was sent in November, 2018, were there

22   other discussions with the defendant regarding the payment of

23   900,000 from the IWM/Salondera redemption?

24   A.  Yes, I had kept Gustavo abreast of discussions that I have

25   been having with respect to prospective buyers of our Dania

1   property.  And my wife and I also own an oceanfront lot in Cabo

2   San Lucas, or San Jose del Cabo, I should say, and that was

3   also a source of liquidity, if that lot were to sell.

4   Q.  Did the defendant stop discussing payment with you at some

5   time?

6   A.  Yes.

7   Q.  And, if you know, why did that happen?

8   A.  I believe that at some point, I started getting emails from

9   his then wife about the collection of the 900,000.

10  Q.  And do you know if the defendant and his then wife were

11  still married when the last email on this email chain,

12  November, 2018, was sent?

13  A.  I believe so, but I'm not certain.

14  Q.  And who was the defendant's wife at that time, or

15  previously?

16  A.  Olympia De Castro.

17  Q.  And before the defendant's arrest, did you ever work with

18  Olympia De Castro?

19  A.  No.

20  Q.  Did you invest with her?

21  A.  No.

22  Q.  How would you characterize your relationship with Olympia

23  De Castro before defendant Gustavo Frieri's arrest?

24  A.  I believe it was social.  I considered both she and Gustavo

25  Hernandez friends and still consider them friends.

1    Q.   Mr. Holtz, I'm going to try again to share government

2    exhibit 2 with you.   Can you see exhibit 2?

3    A.   Not yet.

4    Q.   How about now?

5    A.   There it is.   I see it.

6    Q.   As I did with government's exhibit 1, I'll just scroll

7    through the exhibit first and then ask you what it is.

8    A.   It's an email exchange between myself and Olympia.

9    Q.   And scrolling to the bottom, when was the first email in

10   this email chain sent?

11   A.   Is the one that I'm looking at now the first of that email

12   chain, July 29 of 2019?

13   Q.   I'll scroll down so you can see it.   We're on page 8 of

14   government exhibit 2.

15        Was that the first email, Mr. Holtz?

16   A.   Yes.

17   Q.   And who is this email from?

18   A.   It is from Olympia to me.

19   Q.   And what does the e-mail say or what is this about?

20   A.   Essentially, it thanks me for a $25,000 payment that Walden

21   had made as of July 11 of 2019, and she talks about whether it

22   would be applied to -- she says that it will be applied first

23   to interest.

24   Q.   And there's a reference in this email that Mr. Castro makes

25   to PN.   What does PN stand for?

1    A.   Promissory note.

2    Q.   And what was the proposed promissory note for?

3    A.   There are a number of email exchanges between she and I

4    pursuant to her desire to essentially memorialize the $900,000

5    obligation in the -- in the form of a promissory note.

6    Q.   And on what basis was she requesting the promissory note

7    for 900,000?

8    A.   I had assumed that she wanted certainty as to how much she

9    was going to get and when she was going to receive it and,

10   consequently, wanted the obligation memorialized on paper.

11   Q.   And this is the same 900,000 that in government exhibit 1,

12   in those emails, the defendant had been requesting you for?

13   A.   That is correct.

14   Q.   And so why is Olympia De Castro, in these emails, asking

15   for those funds?

16   A.   I assume that -- that the receivable was transferred to her

17   as part of a divorce settlement and, consequently, she was now

18   wanting to essentially have it memorialized in a more formal

19   way, where previously it was largely a discussion between

20   Gustavo and I.

21   Q.   I believe, Mr. Holtz, you mentioned earlier that at some

22   point, in investing in IWM, you had transferred title in the

23   name of -- to your wife and other members had transferred title

24   to names of their other relatives as well; is that correct?

25   A.   That is correct.

1    Q.   And why, again, was that done?

2    A.   On or around that time, we were making an investment in

3    Domaine Select Wine & Spirits and, as I recall, State Liquor

4    Authority precluded someone from owning both a retailer and a

5    wholesaler in the wine and spirit space.  And between our

6    counsel and State Liquor Authority counsel, as well as

7    Domaine's liquor lawyer, they concluded that if we had

8    transferred our interest in IWM to that of family members, that

9    we would be cleared to acquire a stake in Domaine Select Wine &

10   Spirits.

11   Q.   And Domaine Select Wine & Spirits (indiscernible), just for

12   the record, were forfeited in this case?

13   A.   That is correct.

14   Q.   And when you were acquiring an interest in Domaine Select

15   Wine & Spirits, who were the principals of that company?

16   A.   Myself and Gustavo.

17   Q.   And in the actual DSWS, Domaine Select Wine & Spirits, who

18   were you -- investing in their company, who was the

19   investigators in that company?

20   A.   Paolo (phonetic) and Allison Domenghetti.

21   Q.   Turning back to government exhibit 2, and to page 3 of that

22   exhibit, does Olympia De Castro send you an email regarding the

23   900,000 on September 26, 2019?

24   A.   Yes.

25   Q.   And in this email, she lists several files that are

1   attached, including certain email exchanges?

2   A.   Correct.

3   Q.   And if you can just note, who are the email exchanges

4   between in the attached files that she references?

5   A.   Listed in number four, it is between myself, Jorge Mora and

6   Gustavo Hernandez, with Francesco Noero, our lawyer.  In number

7   5, between myself and Francesco, with Jorge Mora and Gustavo

8   being CC'd, as well as Joe Inzerillo (phonetic).  In number

9   six, from me to Gustavo dated 12/4/2017.

10  Q.   Mr. Holtz, at the time of redemption or sale of Salondera,

11  did you email or otherwise communicate with Olympia De Castro

12  about it?

13  A.   I don't believe I communicated with Olympia until much

14  later.

15  Q.   And did you ever initiate communicating with Olympia De

16  Castro about IWM or Salondera redemption?

17  A.   Let me clarify my earlier answer.  I don't believe that I

18  discussed the issue of IWM or the 900,000 with Olympia much

19  later.  As I testified to earlier, we were social friend, so we

20  may have had communications, phone calls or visits prior to

21  that, but not in connection with these matters.

22  Q.   And did you ever initiate communicating with her about the

23  900,000 IWM redemption?

24  A.   No.

25  Q.   And so these emails that she references in this email and

1    attaches to the September 25, 2019 email, government exhibit 2,

2    did you send her those emails?

3    A.   I don't -- I don't know that I sent them to her.  If -- as

4    I recall, she may have sent them to me as attachments to her --

5    the email that you were just referring to.

6    Q.   I'm going to scroll to the first page of government exhibit

7    2, and for this email -- what is the date of this email, the

8    last email on the email chain in government exhibit 2?

9    A.   October 29, 2019.

10   Q.   And at the time of October 29, 2019, was the promissory

11   note that she had asked for signed?

12   A.   No.

13   Q.   Was a promissory note regarding the 900,000 in question

14   ever signed?

15   A.   No.

16   Q.   And how was the 900,000 payment or the issue regarding the

17   900,000 resolved, if at all, then?

18   A.   As you may recall, there was a time when Olympia suggested

19   that we memorialize the $900,000 obligation in -- in the form

20   of a promissory note.  Originally, she wanted the promissory

21   note to come from me personally.  I refused to do that because

22   the obligation was Walden's.

23        She had subsequently indicated that she would be willing to

24   take a Walden promissory note with my personal guarantee.  I

25   refused to do that.  And subsequent to that, the process was

1    held up because my wife had filed for divorce, and I could no

2    longer -- from the time that she filed the petition, I could no

3    longer incur debt without her consent, so that precluded me

4    from entering into the arrangement that Olympia would have

5    wanted.

6        Subsequent to that, we tried to arrive at an amicable

7    settlement that my wife and her lawyers would agree to.  That

8    didn't work out, so Olympia filed a lawsuit against both

9    Walden, myself and my wife.

10   Q.  Mr. Holtz, I'm going to show you what's been marked as

11   government exhibit 3.  Please let me know if you can see it on

12   the shared screen.

13   A.  I can.

14   Q.  And what is government exhibit 3?

15   A.  That is the complaint that Olympia De Castro filed against

16   me, my wife and Walden.

17   Q.  And this complaint is dated August, 2020, but is that when

18   the suit was initiated?

19   A.  I believe so, although it does refer to a second amended

20   complaint, so there may be a prior complaint filed.

21   Q.  And do you recall when the suit was initiated against you,

22   Walden and your wife?

23   A.  No, I do not.

24   Q.  Mr. Holtz, I'm going to show you what's been marked as

25   government exhibit 4.  Please let me know if you see it.

1    A.   I see it.

2    Q.   And what is government exhibit 4?

3    A.   That appears to be a settlement agreement, or draft

4    settlement agreement, that was negotiated between my divorce

5    counsel, my wife's divorce counsel and Olympia De Castro's

6    counsel.

7    Q.   I'm going to scroll to the end of government exhibit 4,

8    page 7, and you can tell me if the agreement was executed and

9    by whom.

10   A.   It has been executed by me, in my personality capacity, by

11   me, as an officer of Walden, and by my wife and Olympia.

12   Q.   And I'll turn to page 3 of the exhibit.  Excuse me, page 2

13   of the exhibit.

14        And if you can recall, or let us know from page 2 of the

15   exhibit, what are the key terms of how have you settled the

16   matter?

17   A.   The matter was settled in -- to be settled in essentially

18   two forms:  On paragraph 2, number two, reference is made to

19   $82,250 in payments that Walden had made prior to entering into

20   the settlement agreement, and the balance of the funds were to

21   come from sale of proceeds from the Dania Beach mobile home

22   park.

23   Q.   And that Dania Beach mobile home park, is that the same

24   Dania property that was referenced in your email chain with the

25   defendant in government exhibit 1?

```
1    A.   Yes.

2    Q.   And is that property currently being sold?

3    A.   Yes, it is currently under contract.

4    Q.   And when is it expected to close?

5    A.   I'm would say, on or around May of this year.

6    Q.   And how much in proceeds expected -- are expected from that

7    sale?

8    A.   It is under contract for $8,900,000.  There are prior liens

9    of about four million, and I have a 50-percent partner, so my

10   share would be in excess of two million, or, I should say

11   Walden's share would be in excess of two million.

12   Q.   And if the settlement amount is disbursed, what happens

13   next?  What happens pursuant to the terms of this agreement?

14   A.   I would pay the remaining portion of the 900,000, plus

15   interest, to Olympia De Castro.

16   Q.   Mr. Holtz, turning to page 1 of government exhibit 4,

17   there's a description here about the Dania property.  How is it

18   described in the settlement agreement?

19   A.   It says, whereas a third party has signed a letter of

20   intent to purchase a mobile home park located at 801 East Dania

21   Beach Boulevard that is owned by mile marker 55.  A portion of

22   mile marker 55 is owned by Daniel Holtz and/or Toni Holtz and

23   constitutes a joint marital asset of Daniel Holtz and Toni

24   Holtz.

25        Is that what you're referring to?
```

1   Q.   Yes.  And Toni Holtz also executed this settlement

2   agreement?

3   A.   That is correct.

4   Q.   Mr. Holtz, I'm going to share government exhibit 5 with

5   you.  Please let me know if you see it.

6   A.   Yes.

7   Q.   And what is government exhibit 5?

8   A.   That's my -- my answer and Walden's answer to Olympia's

9   second amended complaint.

10  Q.   And when was that filed?

11  A.   From the date stamp, August of 2020; August 28 of 2020.

12  Q.   I'm going to turn to page 6 of government exhibit 5.  On

13  page 6 there are several affirmative defenses listed; is that

14  correct?

15  A.   That is correct.

16  Q.   And here, there's a defense for lack of standing and

17  unclean hands; is that correct?

18  A.   Correct.

19  Q.   Can you please review the factual statements made in

20  support of these defenses and let me know when you're finished

21  reviewing?  And I can zoom in, if that helps.

22  A.   Okay.  I see that.

23  Q.   So now that you reviewed them, are these factual statements

24  made in support of the defenses described on page 6 true and

25  accurate?

1   A.   Again, as I testified earlier, from my standpoint, the

2   assets -- both the IWM investment, as well as the subsequent

3   receivable, were -- in my mind, belong to Gustavo Hernandez.

4        During the time that we owned the investment, I had only

5   engaged in discussions with respect to that investment with

6   Gustavo Hernandez, as well as Jorge Mora.

7        During the negotiations of the sale back to the company of

8   our investment in IWM, my discussions were, again, only with

9   those two parties, and even after we negotiated for the sale of

10  that asset, we, again, spoke between us, as it relates to that

11  asset, and for a long period of time, post closing, when we

12  received the final installment -- because as I recall, the full

13  2.7 may have been paid in more than one installment.

14       So even for an extended period of time, post closing, every

15  time the issue of IWM or the sale proceeds came up, my

16  discussion was with Gustavo.  I viewed it as his asset, but,

17  again, I'm not taking a position on title.  I'm saying, that's

18  just my state of mind at the time that we were negotiating or

19  otherwise discussing any matters having to do with IWM.

20            THE COURT:  So just to be clear, Mr. Holtz, your answer

21  is the factual statements in paragraphs 1 and 2 are accurate

22  from your point of view?

23            THE WITNESS:  (No verbal response.)

24            THE COURT:  Do you understand my question?

25            THE WITNESS:  I do understand the question.  I'm

1    rereading the two elements.

2             THE COURT:  Got it.

3             THE WITNESS:  The two paragraphs.

4             Yeah.  The answer to the question is, yes, I viewed

5    that money, up until some point in, I guess, the latter part of

6    -- sometime in, I want to say, '19 or '20, as belonging to

7    Gustavo Hernandez.

8    BY MS. SONBUNTHAM:

9    Q.   Mr. Holtz, on page 7 of government exhibit 5, there are

10   additional affirmative defenses listed.

11             So let's scroll down and -- the same question.  You can

12   just review, and I'll scroll, as necessary, through this page,

13   and let us know if you believe that the factual statements made

14   in support of these defenses are true and accurate.

15   A.   With respect to number three, yes.

16             With respect to number four, again, as I mentioned earlier,

17   this was an arrangement that our respective counsels, as well

18   as counsel for Domaine, came up with for us to -- for us to be

19   enabled to make an investment in Domaine Select Wine & Spirits

20   because there was a State Liquor Authority prohibition against

21   someone owning a retailer as well as a wholesaler.

22             Five?  As I -- it would not be unusual for Gustavo to leave

23   money at Walden in the event that we were going to make a

24   subsequent further investment.

25             Six is accurate, until Gustavo started to ask for the money

1   back in order for him to meet his legal -- legal-fee

2   obligations.

3        And with respect to number seven, I assumed that all of the

4   discussions that Gustavo had with me, with respect to the

5   funds, were either decided upon by Gustavo Hernandez or

6   otherwise communicated to me by Gustavo with Olympia's consent.

7   Q.  So, Mr. Holtz, why did you enter into a settlement with

8   Olympia De Castro?

9   A.  Again, the obligation was mine.  Gustavo had told me to pay

10  the money to Olympia because the assets had transferred to

11  Olympia.  I had assumed that that transfer was as a result of

12  their divorce settlement, but I don't know that he specifically

13  mentioned that.  But from a practical standpoint, if the party

14  to whom I believe I owed the money to tells me to pay it to his

15  wife, or ex-wife, that's what I would do.

16  Q.  So the 900,000 that was referenced by the defendant in

17  government exhibit 1, do you still owe him that money after the

18  settlement is completed?

19  A.  No.

20       MS. SONBUNTHAM:  Your Honor, no further questions from

21  the government at this time.

22       THE COURT:  Mr. Pasano, any questions on your end?

23       MR. PASANO:  Judge, if I might have just one question

24  to clarify.  And, then, with the Court's permission, although

25  we hope it's necessary because we don't want to keep Mr. Holtz

```
 1   any longer than we have to, maybe we would reserve the right to
 2   recall him.  But my one question --
 3                        CROSS-EXAMINATION
 4   BY MR. PASANO:
 5   Q.   Mr. Holtz, can you hear me?
 6   A.   Yes, sir, I can.
 7   Q.   Sir, sometimes in your answer about assets or debts that
 8   were yours, you used your own pronoun, mine or my, but then
 9   corrected it, that it was actually Walden.
10        Do you remember saying that a couple of times?
11   A.   Yes, I do.
12   Q.   In the email that's exhibit 1, when Gustavo Hernandez
13   talked about his debt, is it fair to say that he was referring
14   to the debt belonging to IWM?
15   A.   Well, I believe that he was referring to the 900,000 that
16   Walden had owed him.
17   Q.   But to Walden or IWM?  That's my question.
18   A.   No.  I owed it to him because the 900,000 came from the
19   sale of our stake in IWM back to IWM or its principals.
20   Q.   So -- and the last point on this:  You say that you were
21   taking a position on title, correct, in answering questions --
22   A.   Correct.
23   Q.   And the transfer to the spouses that was occasioned on the
24   advice of lawyers, that occurred, I think you told us,
25   somewhere around 2015?
```

```
 1   A.   That is correct.

 2           MR. PASANO:  Your Honor, that's all I have for today.

 3           THE COURT:  Any redirect, or any type of follow-up

 4   questions for Mr. Holtz?

 5           MS. SONBUNTHAM:  No, Your Honor.

 6           Thank you, Mr. Holtz.

 7           THE COURT:  Thank you very much, Mr. Holtz, for your

 8   appearance and complying with the subpoena.

 9           THE WITNESS:  Thank you.

10           THE COURT:  You're excused.  Thank you so much.

11           Government's next witness?

12           MR. HAYDEN:  Your Honor, the government would call

13   Olympia De Castro.

14           THE COURT:  Ms. De Castro?

15           Go ahead and swear in Ms. De Castro.

16           THE COURTROOM DEPUTY:  Ms. De Castro, please raise your

17   right hand.

18           (Government witness, OLYMPIA ALENCAR DE CASTRO, duly

19   sworn.)

20           THE COURTROOM DEPUTY:  Please spell and state your name

21   for the record.

22           THE WITNESS:  Olympia Alencar De Castro.

23   O-L-Y-M-P-I-A, A-L-E-N-C-A-R, D-E, space, C-A-S-T-R-O.

24           THE COURT:  Thank you, Ms. De Castro.

25           Mr. Hayden.
```

```
 1                     DIRECT EXAMINATION
 2   BY MR. HAYDEN:
 3   Q.   Good morning, Ms. De Castro.  Can you hear me?
 4   A.   I can hear you.
 5   Q.   What is your current residence or address?
 6   A.   I live on 597 Hibiscus Lane, Miami, Florida, 33137.
 7   Q.   How long have you resided at this location?
 8   A.   I've been here since August of 2014, I believe.
 9   Q.   Who do you reside with at this address?
10   A.   I reside with my three children, and I allow Gustavo to
11   stay here.
12   Q.   Where did you reside prior to this address?
13   A.   I lived in New York.
14   Q.   And what was the address there?
15   A.   It was 3 Gramercy Park West, New York, New York, 10003.
16   Q.   And how long did you reside at that location?
17   A.   I lived there from '05 until I left in 2014.
18   Q.   And who did you reside with at that address?
19   A.   I resided there with Gustavo, and I had two children there.
20   Q.   And why did you move to your present location?
21   A.   Because of the warmer weather and to have the children
22   spend more time outdoors.
23   Q.   How long do you intend to reside at your current address?
24   A.   I am considering moving back to New York for work purposes.
25   Q.   And when would that be?
```

```
 1   A.   If I move, it would have to be after the school year, so,
 2   the summer.
 3   Q.   And where do you intend to reside once you leave your
 4   current address?
 5   A.   In Brooklyn.
 6   Q.   Do you have an address?
 7   A.   It depends on the job I have and whether I can afford --
 8   depending on what I can afford, but, yeah.
 9   Q.   Okay.  And where are you currently employed?
10   A.   So I currently have the -- three jobs.  I work for an
11   ultra-high net worth family as the CIO, doing investment
12   decisions for their portfolio, and also as a CFO for their
13   operational businesses.  I'm also a CFO for an ethical fashion
14   brand that's bringing manufacturing back to the U.S., and I do
15   consulting for other operating companies as a -- in terms of
16   corporate finance.
17   Q.   Do you have an office?
18   A.   I work from my house.  It's COVID.
19   Q.   Okay.  So you work from 597 Hibiscus?
20   A.   Correct.
21   Q.   And how long have you been employed in these three jobs?
22   A.   So the ethical fashion brand, I've been doing it for about
23   five months, and then the family office, I've been with them
24   since May of last year, and then, the consulting, it's on and
25   off, different things.
```

1   Q.   What is your approximate annual income from these jobs?

2   A.   This year, it'll be approximately $400,000.

3   Q.   Where were you employed prior to these positions?

4   A.   I had an impact investment firm where I ran a hedge fund

5   focused on bringing job creation to the U.S. and responsible

6   financial inclusion.  It was based out of San Francisco and --

7   Q.   And how long were you -- go ahead.

8   A.   And I was -- I started that firm in 2013.  Sorry to

9   interrupt.

10  Q.   No problem.

11       And what was your approximate annual income earned the

12  years you were with that company?

13  A.   So I was an owner of that company.  I had a 13-percent

14  stake.  In the beginning, I had a lower income, as we were

15  getting ramped up and trying to build assets in our management.

16  I started out with 125, and then gradually went up to about

17  $250,000, and I was expecting distributions from the equity

18  side.

19  Q.   Aside from the income that you earned with your employment,

20  what other income have you have earned since you met the

21  defendant?  Have there been investments or --

22  A.   Well, I was a banker at Bank of America.  I was also a

23  banker at Goldman Sachs, doing investment banking.  I left.  I

24  worked at the IFC, the for-profit arm of the World Bank.  I had

25  an IRA, life insurance, but that's not income, and, then, the

1    investments that come from the times that I worked in these

2    jobs.

3    Q.   How long have you known the defendant, Mr. Hernandez

4    Frieri?

5    A.   I met him in 2002 or three.

6    Q.   And what's your current relationship status?

7    A.   Divorced.

8    Q.   With Mr. -- okay.

9         How long were you married?

10   A.   We were married from 2007 until 2020.  I think we got

11   divorced, February 10th of 2020.

12   Q.   And when did you first meet, you said?

13   A.   We met in -- around the end of 2002, the beginning of 2003.

14        Is it okay if I drink some water?  That's okay, right?

15   Q.   Sure, absolutely.

16        And where did you meet?

17   A.   I was working as a mortgage broker financing commercial

18   real estate at the time.  I was 20.  I was looking to finance a

19   commercial real estate property where he was an equity investor

20   of.

21   Q.   And where did the defendant work when you met him, you

22   said?

23   A.   He worked at -- at Global, but I was financing at a

24   different -- he was just an investor where I was -- in the

25   project I was working on.

```
 1    Q.   What company --
 2            THE COURT:  When you say -- yeah.  Can you give us the
 3    name of that company again?
 4            THE WITNESS:  Global Securities.
 5    BY MR. HAYDEN:
 6    Q.   And what did you understand his employment responsibilities
 7    to be at Global Securities?
 8    A.   I understood Global Securities to be a broker-dealer based
 9    out of Miami, and he was -- he worked with his brother there.
10    Q.   And what was his approximate income at the time?
11    A.   At that time, in 2000 -- like, early 2000?  I don't know.
12    Q.   I guess, prior to your marriage.
13    A.   I'm guessing, like, 250.  I don't know.
14    Q.   Okay.  Do you know if he had any income or investments
15    outside of his employment?
16    A.   At what point?  At what period in time?
17    Q.   Prior to your marriage.
18    A.   Prior to our marriage -- I don't know.  I mean, I'm sure he
19    did -- I guess he had -- yeah, I don't know.
20    Q.   Okay.  And where did the defendant reside when you met him?
21    A.   When I met him, he resided in Miami.
22    Q.   Did he own his residence?
23    A.   No.
24    Q.   Where did you reside when you met him?
25    A.   In Miami.
```

```
 1   Q.   Did you own your residence at that time?

 2   A.   No.

 3   Q.   What was the approximate value of your assets prior to

 4   marrying the defendant?

 5   A.   Probably 350, 400,000.

 6   Q.   Do you know what the approximate value of the defendant's

 7   assets were prior to your marriage?

 8   A.   I imagine, maybe a little bit more.

 9   Q.   500,000?

10   A.   Probably exactly.

11   Q.   And where did you reside with the defendant when you got

12   married?

13   A.   So when we got married, we lived in Gramercy Park West,

14   yeah.

15   Q.   And who owned the property where you resided when you got

16   married?

17   A.   It was -- Gustavo's family's trust owned it.

18   Q.   Was that a -- why did you decide to move to New York from

19   Miami?

20   A.   I was living in Geneva, actually.  I was working for

21   Goldman Sachs in Switzerland, and I was working wealth

22   management at the time.  I wanted to work in investment

23   banking, and I was dating Gustavo from a distance.  And then I

24   had the choice to either move to London or New York, and in

25   order to, you know, be together, I chose New York.
```

1    Q.   Did the defendant share with you where the money from the

2    family trust came from?

3    A.   No.

4    Q.   Do you know how much the residence at 3 Gramercy Park cost?

5    A.   I do.  It was -- it was about 2.9, a little bit above.

6    Q.   2.9 million?

7    A.   Correct.

8    Q.   Do you know how much your household expenses were,

9    approximately, at that time?

10   A.   Yeah.  We didn't have children then, but the maintenance

11   fee was about nine -- a bit over $9,000 a quarter, and then

12   assessment fees ranged between 60 K or more a year.  Then,

13   lights and other things.  So I'm guessing, 100 -- a hundred,

14   hundred fifty.  Depends whether or not you include food or not,

15   et cetera.

16   Q.   Was there a mortgage?

17   A.   No mortgage.

18   Q.   So it was paid for outright?

19   A.   Correct.

20   Q.   Did you contribute anything to that?

21   A.   I did not.

22   Q.   Who paid the expenses, the monthly household expenses?

23   A.   So before we got married, it was -- Gustavo arranged for

24   it, and then, after we got married in '07, you know, I would

25   help not with the maintenance, but with the -- some of the

1   upkeep, like fixing the air-conditioning and, you know, things

2   like -- things like that that came up.

3   Q.   Where did the defendant work after your marriage?

4   A.   After we got divorced?

5   Q.   No, after your marriage.  I'm sorry.  I think we asked

6   where he worked prior.

7        Did he work anywhere else after you got married?

8   A.   In some -- it was always within the Global Securities

9   entities.  I'm not sure which one.

10  Q.   So his employment didn't change; is that --

11  A.   I mean, I know that he was then running a hedge fund in New

12  York, whereas in Miami it was a broker-dealer.

13  Q.   Okay.  And do you know what his approximate annual income

14  was after your marriage?

15  A.   So, roughly, three, 350, maybe four.  Depends on the year,

16  I guess.

17  Q.   Okay.  Do you know what income or investments he had

18  outside of his employment?

19  A.   I did not.  I mean, I did.  There were investments, but,

20  exactly the number, no.

21  Q.   Did he share the details on any of those investments with

22  you?

23  A.   High level.

24  Q.   How many investments would you say, approximately, he was

25  involved with?

```
 1   A.   So there was a public markets and a private markets side.

 2   The public markets, you know, they had the different -- or he

 3   had the fixed income trading account tied to the broker-dealer

 4   and then some private investments.

 5   Q.   Okay.  And were you party to any of these investments?

 6   A.   Well, I became party to -- to Italian Wine Merchants, if

 7   that's what you mean by party.

 8   Q.   Yes.  Did he involve you -- were you, you know, a business

 9   partner?  Did you contribute any capital?  Did you -- were you

10   involved?

11   A.   Yeah.  So I was involved with Italian Wine Merchants.

12   Q.   And what is Italian Wine Merchants?

13   A.   It's a retail wine shop in New York, in Union Square.

14   Q.   And how did you become involved with Italian Wine

15   Merchants?

16   A.   So I -- well, at first, when it was owned by Gustavo, it

17   was more -- well, I was always in the capacity of, let's say,

18   driving revenue for the business by hosting events.  I had an

19   event space on the ground floor, with a chef.  It couldn't be a

20   restaurant because it didn't have the license, but it did have

21   a space where we would bring prospect buyers, you know, wine

22   collectors, try to build clientele.

23        I hosted events there myself with my firm.  I brought some

24   wine collectors, in that sense.  I had my sister work and lead

25   the event space.  She came from five years at a five-star hotel
```

```
 1   at the Mandarin, so she came to lead the event space.  And then
 2   I, at one point, built the financial model for IWM.
 3   Q.  So is this where you met Gustavo?
 4   A.  I'm sorry?
 5   Q.  Is this where you met the defendant?
 6   A.  No, I met him in Miami.
 7   Q.  Oh, that's right.
 8       Were there any other investments that you can think of that
 9   you were involved with with your husband at that time?
10   A.  Not that I can think of right now.
11   Q.  Did you put any money towards the investment in IWM?
12   A.  When it was initially -- when the investment was initially
13   made, no, I did not.  I did not, no.
14   Q.  Do you know when that was, ma'am?
15   A.  I would have to look at the -- I can look at the timeline.
16   I have it written down, but I think it was around '08.
17   Q.  And do you know how much your -- the defendant contributed
18   to it at that time?
19   A.  $900,000.
20   Q.  My question is, how did his employment income or income in
21   other investments change in the time you were married until you
22   were divorced?  Like, did he earn more over the life of the
23   marriage?
24   A.  It depends on the year.  I don't know.  I mean, yes.  It
25   depends on the year.  He was trying to build a business, so,
```

```
 1   definitely he was -- started to earn more.
 2   Q.   How would you characterize your income over the life of
 3   your marriage with him?  Did it stay the same or --
 4   A.   Yeah.  It started out strong.  And, then, I took a step
 5   back from banking to pursue a master's in economic and
 6   political development at Colombia, so I would do more
 7   development work and kind of merge for-profit markets with
 8   making a difference of the world.  And, then, I had three
 9   children within three years, so, 2013 -- or 2011, '13, '15.
10   But even then, in '13, I was launching a hedge fund, and in
11   2014, you know, so balancing what it means to be a woman and be
12   working, you know, so, yeah.
13   Q.   Was there a time that --
14   A.   After -- with the hedge fund, I started earning -- again,
15   we were building that business as well.
16   Q.   So, I guess, did you -- did you stay home when you were in
17   grad school?
18   A.   I never stayed at home.
19   Q.   Okay.  I didn't know if you --
20   A.   No.  I worked in -- I lived in India for three months.  I
21   did microfinance there.  I lived in D.C. for three months.  I
22   worked for the World Bank there.  And, then, I worked for a
23   microfinance investment vehicle in D.C. afterwards.  Even when
24   I had children, I was consulting for a Lewis merger group, so I
25   was always working, even if I had to be breastfeeding at home.
```

1    Q.   Okay.  How many bank accounts did you and your husband own,

2    either separately or jointly, throughout your marriage?

3    A.   We never had a joint account.  And I had -- I had a savings

4    account, a checking account, an investment account, an IRA,

5    life insurance and my ownership in CIM, my firm.

6    Q.   Do you know how many bank accounts your husband had?

7    A.   I know he had a Bank of America account.  At one point, he

8    had a Chase account, and then he had his investment account at

9    the broker-dealer.  I don't know if he had other accounts.

10   Q.   Okay.  And what did you deposit into your accounts?

11   A.   My -- my income.

12   Q.   Okay.  Any investment income?

13   A.   I -- yes, yeah.

14   Q.   That was deposited into those accounts?

15   A.   I mean, minor, you know, like money markets, you know,

16   nothing major.

17   Q.   Okay.  And how many trusts do you have?

18   A.   Can you rephrase the question?

19   Q.   Like, trust --

20   A.   Yeah.  So --

21   Q.   Do you --

22   A.   So I'm a trustee to 597 Hibiscus Lane Revokable Trust --

23   Q.   Okay.

24   A.   -- and I am grantor to D.C. 2019 Irrevocable Trust.

25   Q.   And both of those were after your divorce or --

```
 1   A.   No.  Let me think.
 2        So 597 was created for the purpose of purchasing the home
 3   here in Miami, for the benefit of the children, and D.C. 2019
 4   Irrevocable Trust was created in February of 2019.  I had filed
 5   for divorce, but I got divorced on February 10 of 2020.
 6   Q.   Did you have any other trusts during the course of your
 7   marriage?
 8   A.   I owned -- I had just this -- just the house in Miami over
 9   the -- during the course of the marriage.
10   Q.   Okay.  Did you receive any inheritance prior to your
11   marriage?
12   A.   No, always had to work.
13   Q.   Do you know how many trusts the defendant had during your
14   marriage?
15   A.   I don't know.
16   Q.   Or that he was involved with?
17   A.   I don't know in what capacity, but I know there was the
18   H.H. Trust.
19   Q.   And what is the H.H. Trust?
20   A.   It's a -- it's a -- Gustavo's family trust, was created by
21   his father, and his sister was the beneficiary.
22   Q.   Okay.  Do you know if the defendant had any inheritance
23   prior to your marriage outside of that trust?
24   A.   Are you classifying the Trust as his inheritance?
25   Q.   No, no; I would not classify it that way.  Separately, I
```

1    guess.

2        So was there any inheritance or any source of money that he

3    may have had, outside of the income and investments and the

4    trust like --

5    A.   I don't believe so.

6    Q.   Okay.  So you said you moved to Miami in 2013; is that

7    accurate?

8    A.   No.  I purchased the house in 2013, December, and I moved

9    to Miami in August of 2014, the summer of the school year.

10   Q.   What did you do with the marital residence in New York when

11   you moved to Miami?

12   A.   It's -- just stayed there.  At one point we were able to

13   convince the -- the other residents to allow us to rent it for

14   a year, but, otherwise, it just stayed there.

15   Q.   Okay.  How much was the new residence in Miami?

16   A.   Miami was 2.7 million.

17   Q.   How was the residence in Miami paid for?

18   A.   This was paid by -- so 2013, December, you know, Gustavo

19   and I had just had my second child.  I was soon to be pregnant

20   with my third.  Gustavo and I sat together, and he said that he

21   would sell assets from an investment account that he had to pay

22   for the house, and we agreed that it would be done in the

23   benefit of the children and put into a revocable trust.

24   Q.   Do you know what investment account it was?

25   A.   It was -- I imagine it's within the Global Securities

1  broker-dealer.

2  Q.   Okay.  And was the -- do you have a mortgage on that house,

3  or did you have a mortgage?

4  A.   No mortgage.

5  Q.   And how much would you say that the monthly household

6  expenses were for Hibiscus?

7  A.   So it's approximately -- the association fee is about 2,500

8  a year; real estate taxes is about 40,000 a year; utilities is

9  about 500 a month; phone, cable, is about 150; the pool

10 maintenance is about 90 a month; the pest control is about 90 a

11 month; landscaping is about $800 a month.

12 Q.   And who paid those expenses?

13 A.   So some of it was arranged by Gustavo's office.  His

14 secretary would do it.  Some of it, I would do it here, so --

15 so the pest control, I did.  The pool, I did.  You know, if the

16 refrigerator broke down, I did.  AC, I did.

17 Q.   Okay.

18 A.   And, then, nowadays -- sorry.  Go ahead.

19 Q.   Go ahead.

20 A.   Nowadays, I pay for everything.

21 Q.   Okay.  And I'm going to shift a little bit.

22      Where were you when the defendant was arrested on his money

23 laundering charges?

24 A.   I was in Italy with him.

25 Q.   How long did you stay in Italy after his arrest?

```
1    A.   Sorry.

2    Q.   Take your time.

3    A.   I was there for -- he was arrested, I think, on a

4    Wednesday.  And my son was in the bed with us when they

5    arrived, so I get a little emotional.  But I stayed until -- I

6    think I left on a Sunday -- on a Saturday or Sunday.

7    Q.   So within a week, you left?

8    A.   Yeah.  I was booked to leave -- I was booked to leave.

9    That was the flight.

10   Q.   How many times did you visit the defendant in Italy after

11   his arrest?

12   A.   I took my son, my eldest son, to see him in October, and

13   then I took the children to spend Christmas with him.

14   Q.   So twice?

15   A.   Yeah, I took the children twice.

16   Q.   And how long were your visits?

17   A.   So at first, with my son, I think I stayed two days, just

18   trying to -- he kept -- he had been a bit traumatized with

19   Gustavo leaving, so I was trying to find a way to make that

20   reconnection so he didn't -- so he felt there was a father

21   figure.  So I took him, but I didn't want him to stay too long

22   so he wouldn't figure out that Gustavo was on house arrest.  So

23   it was kind of, like, a quick sort of thing.  Then, later, I

24   took him for two months, during Thanksgiving and at Christmas

25   holidays, so the other children could spend time with him.
```

```
 1    Q.   And how did you pay for your visits there?

 2    A.   I paid for it from my money.

 3    Q.   So out of -- out of your account?

 4    A.   Files and my account.

 5    Q.   How much money was your -- would you say your husband was

 6    -- you know, the defendant was contributing to your marriage

 7    prior to his arrest?

 8    A.   I don't know.  I mean, my bills are like my salary,

 9    400,000, so half of -- like, a little bit more than half of

10    that.  I don't know.

11    Q.   So 250,000, roughly, do you think he was contributing?

12    A.   Maybe more.  It depends on what you include there, but,

13    yeah, approximately.

14    Q.   Okay.  So you said you were contributing about that same

15    amount, or 400,000 a year?

16    A.   No.  I think I was -- depends on the year, but, certainly,

17    like, 100.  It depends on the year.

18    Q.   Do you know what the approximate value of your jointly-held

19    assets were prior to his arrest?

20    A.   The only joint asset we had was a car.

21    Q.   Okay.  I think we'll get to that a little bit later.

22         Do you know what the value of your separately-held assets

23    were, roughly?

24    A.   So -- well, I think by the time that -- you mean, after the

25    divorce?
```

```
 1   Q.   Basically, after his arrest.

 2   A.   I don't know.

 3   Q.   Did you have savings, you know, anything like --

 4   A.   Yeah.  My side, probably around 450.

 5   Q.   Okay.  You mean 450,000?

 6   A.   Yeah, 450,000; 500, yeah.

 7   Q.   And, then --

 8   A.   Maybe more.  It depends if you include cash and the equity

 9   investment, because the equity investment I had in my company

10   would have been worth a million if they weren't paying me out

11   everything, so --

12   Q.   Sure.  But that was not liquid, right?

13   A.   Well, it's become liquid over time.

14   Q.   Okay.  But at that time?

15   A.   At that time, it was just an investment.

16   Q.   What type of tax returns did you file while you were

17   married to the defendant?

18   A.   So as of -- as of '15, I think I filed married, but

19   separate.

20   Q.   Okay.  And prior to that?

21   A.   Prior to -- prior to that, I think we filed joint.

22   Q.   How would you describe your relationship with the defendant

23   up until the time of his arrest?

24   A.   He's a good father.  He's a good person with me.  We had a

25   -- everything -- I mean, it was fine.
```

1    Q.   Okay.  Did you file -- I apologize.  I have one question I

2    want to follow up on.

3         Did you file your taxes every year?

4    A.   So we filed jointly, I guess, before, and then, when he was

5    arrested, I learned that we hadn't filed for the last three

6    years, so I asked the accountant to file for me separate.

7    Q.   So have you then filed those taxes?

8    A.   I had filed my own taxes.  I had paid for them with my

9    money.

10   Q.   Okay.  Do you know why they weren't filed?

11   A.   I think he was waiting for K-1s or -- something about

12   investments.  There were K-1s missing or --

13   Q.   And he didn't disclose to you that they weren't being

14   filed?

15   A.   It's not like he didn't disclose it.  It didn't come up, I

16   guess.  I assumed they had been filed, you know.

17   Q.   And what was --

18   A.   I mean -- sorry.  I was going to say, I provided all the

19   expenses for those years; you know what I mean?  So...

20   Q.   Okay.  What was the state of your finances after the

21   defendant's arrest?

22   A.   So I started working more for my firm.  I asked for a

23   raise.  Eventually, I left.  They -- we entered an agreement

24   that they would pay out my equity, so I could receive that, and

25   I took three jobs to make sure I could pay all my bills.  And

 1   I'm hopefully finding a better -- you know, one job instead of

 2   three is my hope.

 3   Q.   Okay.  Do you know why the defendant resigned from his job

 4   after his arrest?

 5   A.   I don't know if -- what I understand is that his brother

 6   asked him to leave.  And I lost health insurance.  I was

 7   informed that I had no more health insurance.

 8   Q.   And do you know when he resigned or left the company?

 9   A.   I think, after he was arrested, the family was in shock and

10   had him -- you know, removed him from the company.  I don't

11   know.  I just know I was informed that I had no more health

12   insurance.

13   Q.   How did his arrest and resignation impact your ability to

14   maintain your lifestyle?

15   A.   It impacted more my work in the sense I had to work more.

16   You know, I -- I revisited all the bills, and cut costs where I

17   could, and tried to make out a plan for how I would be able to,

18   you know, raise my children.

19   Q.   So what funds did you have available then?  Was it just

20   your income?

21   A.   Just my income.

22   Q.   When did you first discuss divorce with your husband?

23   A.   Well, I had mentioned it before, when I visited, and then I

24   made up my mind during the period that he was detained in Rome,

25   on his way to be extradited.  And I lost my -- I lost my job at

1    that point, and I made up my mind to get divorced.

2    Q.   And you're saying that -- just to -- so I understand, you

3    said that you discussed it with him when you visited him, and

4    that's back when you visited over the holidays?

5    A.   Yeah.  I said that I would consider -- I was considering

6    it, but he ultimately learned that we were getting divorced

7    when he arrived here.

8    Q.   So whose idea was the divorce?

9    A.   Mine.

10   Q.   What was the purpose of the divorce?

11   A.   Well, I mean, Gustavo had been arrested and charged with

12   very serious crimes, and I wanted my children and I to have the

13   opportunity to move on with our life.

14   Q.   Was it hard to find employment after your husband's arrest?

15   A.   I was employed at the time.  I still stayed with that firm

16   for a year, my firm.

17   Q.   Where did the defendant arrive after his extradition from

18   Italy?

19   A.   So when he was extradited, he got bond, and he showed up

20   here, at the house.  And I served him the divorce, and I said

21   he could stay so he could be with the children until he

22   couldn't be with the children anymore.

23   Q.   Okay.  I'm going to attempt to show you what is government

24   exhibit 21, so -- if I fail at this, it's my fault, so...

25   A.   Of course.

```
 1    Q.   Can you see this exhibit?

 2    A.   I cannot.

 3    Q.   Can you see it now?

 4    A.   No, but I have a -- well, actually, I don't have your

 5    exhibits.  I don't have the exhibits.

 6    Q.   Hold on a second.  Let me see if I can do this.

 7         Can you see it now?

 8    A.   I can.

 9    Q.   Okay.  So what is this document?

10         Oh.  You said you can't see it?

11    A.   No, I can.  I can see it.

12    Q.   Okay.

13    A.   I guess this is the bond -- the bond hearing transcript.

14    Q.   It is.

15         And what is the date of this hearing?

16    A.   May 17, 2019.

17    Q.   Do you recall when you entered into the marital settlement

18    with the defendant, the date of that?

19    A.   Yes.  I entered into the marital settlement -- can I look

20    at the timeline?  I mean, I think it was -- I got divorced,

21    February 10th.  I filed in January.  We were already

22    negotiating a marital settlement, so it has to be the end of

23    '19, I think, end of '19 sometime.

24    Q.   And so looking at exhibit 21, if you turn to page 4, line 2

25    -- let me see if I can pull that up for you.
```

```
 1        It's page 4, line 4.  I'm sorry.  Do you see that?
 2   A.   I see that.
 3   Q.   And it says you're present in court.
 4        Is that accurate, that you were present for the bond
 5   hearing?
 6   A.   Yes, I was.
 7   Q.   Okay.  I'm going to move forward to page 19, and I'm going
 8   to go to line 8.
 9        Do you see who is speaking here?  This is the Court.
10   A.   Okay.
11   Q.   And I'm going to scroll down to lines 19 to 22, where it
12   says -- it's talking about the homestead in Miami, and it says
13   that -- make sure that his interest, the defendant's interest
14   in that property, is also pledged as part of his bond.
15        Do you see that?
16   A.   I see that.
17   Q.   Okay.  Do you recall that discussion during the bond
18   hearing at all?
19   A.   No.  It was a very emotional hearing.
20   Q.   Okay.  What consideration was given to the defendant's
21   court-ordered bond conditions not to encumber the Miami
22   property when you had your discussions about the MSA?
23   A.   I don't see how the property is encumbered, but I'm not an
24   attorney.
25   Q.   I'm sorry.  I didn't -- I didn't hear you.
```

1  A.   Can you clarify?  Because I don't understand how the

2  property is encumbered.

3  Q.   So the bond said that the defendant's interest in the

4  homestead, in that property, was not to be diminished.  Okay?

5  A.   Uh-huh.

6  Q.   So was any consideration given to that in your discussion

7  regarding the marital settlement agreement with the defendant?

8  A.   I mean, I -- my attorney was Amy Steele Donner, you know.

9  She knew what was going on.  And the discussion that we had was

10 that, you know, I was co-trustee of the house; I was paying all

11 the bills; the house is in the benefit of the children, and

12 so -- you know, I was trying to clarify how, you know, I would

13 -- I would continue to do the role of what I was already doing,

14 just paying for everything, and Gustavo was incapacitated to be

15 a trustee.  So she wrote in the MSA for him to step down as

16 co-settlor, I think it was.

17 Q.   So there really wasn't consideration given, I think, to --

18 A.   I don't understand how -- I don't understand the legal

19 terminology.

20 Q.   So I -- let me rephrase it.

21      Did the defendant ever raise to you that he was not able to

22 pledge that property, or his interest in that property to you,

23 during the discussions of the marital settlement agreement

24 based on the conditions of his bond?

25 A.   No, because the kids are the beneficiaries, so I don't see

1   how he's pledging it.

2   Q.  Well, he has an interest in the property, right, as a

3   co-settlor?  At the time of the bond, he did.  That's what I'm

4   asking.

5   A.  Okay.

6   Q.  When you're trying to negotiate that out, that changes at

7   some point; is that accurate?

8   A.  I don't know.

9   Q.  Okay.  Do you know when the defendant pleaded guilty?

10  A.  No.  I don't know exactly the dates, but 2019 sometime.

11  Q.  Okay.  And do you know if -- if any consideration was given

12  to the defendant's plea agreement prior to finalizing your

13  divorce?  Do you ever recall anything --

14  A.  I don't understand.

15  Q.  Do you ever recall having any discussions with the

16  defendant regarding any conditions of his plea prior to

17  finalizing your divorce in February of 2020?

18  A.  No.

19  Q.  Okay.  How would you describe your relationship with your

20  husband since the divorce?

21  A.  Amicable.

22  Q.  I'm going to attempt to show you government exhibit 6,

23  okay?

24  A.  Okay.

25  Q.  Do you see government exhibit 6?

1   A.   I see it.

2   Q.   Do you recognize this document?

3   A.   I do.

4   Q.   What is it?

5   A.   It's the MSA, right?

6   Q.   The marital settlement agreement.

7   A.   Okay.

8   Q.   Do you know what -- what is the date on the document?

9   A.   I think it's January of 2019, but I don't see it where --

10  where you're at -- oh.  No, I don't think I see it.

11  Q.   Oh, you know what?  It's not on there.

12  A.   It's here.  24th, yeah, 2020.  There it is, the 24th, yeah.

13  Q.   I'm going to scroll down to page 8 of this document, and

14  it's going to be paragraph 13.

15  A.   Mmm-hmm.

16  Q.   There we go.

17       Can you see the investment account?

18  A.   Yes.

19  Q.   Who is the guardian of this account?

20  A.   Meaning, like, the adult in the account was Gustavo.

21  Q.   And who is the guardian now?

22  A.   I am the sole legal guardian of the children.

23  Q.   And you are also the -- are you the guardian of the

24  investment account as well?

25  A.   Yeah.  It's $50,000, which I've used for tuition.

1    Q.   What access does the defendant have to this account?

2    A.   None.

3    Q.   How much was in the account prior to the divorce?

4    A.   $50,000.

5    Q.   Who made those contributions?

6    A.   We did.

7    Q.   From your separate accounts?

8    A.   Well, I mean, from us being married.  It's for our son, but

9    I guess Gustavo funded it, technically.

10   Q.   So Gustavo funded it?

11   A.   Yeah.  When we were married, yes, Gustavo funded it.

12   Q.   Do you know what the source of those contributions were?

13   A.   Probably the same -- it was $50,000, so probably the sales

14   from the -- from his trading account or --

15   Q.   And how often were contributions made to this account?

16   A.   It was a one-time contribution for $50,000.  We talked

17   about opening a 529 for the children.  We never got around to

18   doing it.  This was an attempt to do a 529, at the time, and

19   for only one of the children.

20   Q.   So you never opened 529s for the children?

21   A.   At the time we were married, no.

22   Q.   Have you done so since?

23   A.   The trust has.

24   Q.   The -- what trust?

25   A.   The D.C. 2019 Trust has.

1    Q.   Has opened 529s?

2    A.   For the children.

3    Q.   Do you know if any money was taken out of this account

4    after the defendant's arrest?

5    A.   This account?

6    Q.   This investment account, yes.

7    A.   Yes.  It ceased to exist because it was after the divorce.

8    It was -- I became the legal guardian for Gabriel, and so I

9    created an account in Gabriel's name, that I deposited

10   Gabriel's money, which is our son.

11   Q.   Okay.  And was it the full 50,000 that you put into

12   Gabriel's account?

13   A.   Yeah, the -- I think Cor Clearing ceased to exist and

14   issued a check, a certified check, that I could only deposit in

15   Gabriel's name.

16   Q.   And is the full 50,000 still in Gabriel's account?

17   A.   No.  I used it to pay his school.

18   Q.   Oh, okay.

19        And how much is tuition?

20   A.   Tuition for each child is $30,000, plus --

21   Q.   Per year?

22   A.   Per year, yeah.  So -- plus, his soccer; plus, the woman

23   that helps me so I can work; plus, his tennis.

24   Q.   Okay.

25   A.   You know, like, occupational therapist.

1   Q.   Is there anything else left in the account now?

2   A.   It's an account at Chase.  It doesn't have funds right now,

3   but it's there.  I hope, one day, it'll have money again.  I

4   would love my son to have money in that account to pay his

5   education, for sure.

6   Q.   Do you know if -- did the defendant ever borrow money out

7   of this account after his arrest?

8   A.   He has -- so -- after Gustavo's arrest, the bank closed

9   down his bank accounts, so he doesn't have bank accounts

10  anymore.  He doesn't have bank accounts, so he doesn't have

11  access to this money.  Plus, it's in the marital settlement

12  that it's for Gabriel -- was for Gabriel, so it's in Gabriel's

13  account.

14  Q.   Let's scroll to page 10 of the document.  Paragraph 17, do

15  you see where it says automobiles?

16  A.   Yes.

17  Q.   How was this automobile paid for prior to the defendant's

18  arrest and your divorce?

19  A.   I was paying for it after his arrest.  He was paying for it

20  before his arrest.

21       So he was arrested in '18, July of '18, and thereafter I

22  was paying for it.  Yeah, I didn't -- I mean, if my name wasn't

23  there, I would have handed the car back, but it was my credit.

24  Q.   And what was the approximate value of the automobile?

25  A.   So my payments a month were about $1,600, which is a

```
 1   fortune.
 2   Q.  Okay.  And do you know what the total cost of the
 3   automobile was, like, when he purchased it?
 4   A.  So I sold the car for $60,000 recently, so that I could get
 5   some of it paid, so I could cut down my costs.
 6   Q.  Do you know what the defendant paid for it initially?
 7   A.  It's -- it's financing, so it's --
 8   Q.  Was there any money down or was it all financed?
 9   A.  Maybe, like, $40,000 down, I think.  I don't know.
10   Q.  Okay.  I'm going to scroll to paragraph 18, where it says
11   bank and financial accounts.
12   A.  Yeah.
13   Q.  It says that you own all the accounts in your name.
14       How many bank accounts, at that time, met that description?
15   A.  I think I had, maybe, four or five bank accounts.
16   Q.  Okay.  And do you -- can you recall what the value of each
17   at the time of your divorce was, roughly?
18   A.  So, probably 400,000 or so.
19   Q.  Total, amongst all of the accounts?
20   A.  Yeah, like I said before, right?  400, 500.
21   Q.  Okay.
22       THE COURT:  Let me stop you on that point, and we'll
23   take a five-minute break for the court reporter.
24       MR. HAYDEN:  Yes, Your Honor.
25       THE COURT:  Everybody come back, though, in five
```

```
 1    minutes.

 2              THE WITNESS:  Okay.  Thank you.

 3              MR. LUNKENHEIMER:  Your Honor, this is AUSA Kurt

 4    Lunkenheimer.  My wife was having knee surgery, and I just got

 5    notified that I need to pick her up from the hospital, so I

 6    will leave you with Mr. Hayden and Ms. Sombuntham, if that's

 7    okay.

 8              THE COURT:  That's fine, of course.  Thank you.

 9              THE WITNESS:  So I'm going to mute and go to the

10    bathroom.  That's okay, right?

11              THE COURT:  Yes.  Everybody has five minutes.

12              THE WITNESS:  Okay.  Thank you.

13              (Court recessed at 12:01 p.m.)

14              (Back on the record at 12:10 p.m.)

15    BY MR. HAYDEN:

16    Q.  Ms. De Castro, I believe we were discussing the bank

17    accounts in paragraph 18.

18         Do you still see that on your screen?

19    A.  I do.

20    Q.  You had mentioned that the roughly $400,000 that you had,

21    sort of, spread out amongst the four or five bank accounts that

22    were separately yours at that time?

23    A.  Correct, yes.

24    Q.  Did the defendant ever make any contributions to those bank

25    accounts, or was that all of your separate contributions?
```

```
1    A.   That's all mine.

2    Q.   Okay.  Was there no accounting of the defendant's bank

3    accounts at that time?

4    A.   Because he had no bank accounts.

5    Q.   And why didn't he have -- no bank accounts?

6    A.   The bank shut him down.  He was -- so this is 2019?  '20;

7    this was January 2020.  Gustavo was arrested in 2018.

8         By the end of -- by the end of 2018, I think, they had shut

9    down all of his bank accounts.

10   Q.   So what happened to the funds in those accounts, if you

11   know?

12   A.   I think he had $5,000 in Bank of America, and it was handed

13   over to you guys.  I don't know.

14   Q.   Okay.  All right.  I'm going to scroll down to paragraph

15   19, just below 18, and it says retirement accounts and

16   brokerage accounts.

17        Do you see that?

18   A.   Yes.

19   Q.   Do you know why there was no accounting of the defendant's

20   retirement?

21   A.   I don't think he had one.

22   Q.   Okay.  And do you know why there's no accounting of the

23   defendant's brokerage accounts?

24   A.   I don't think they existed anymore.

25   Q.   Do you know what happened to the funds that were in them?
```

```
 1   A.   No.
 2   Q.   Do you know why there was no accounting of your brokerage
 3   accounts?
 4   A.   What do you mean?
 5   Q.   Well, the heading is retirement and brokerage accounts, and
 6   it delineates that you have a retirement account, but did you
 7   have any brokerage accounts?
 8   A.   I think I did.
 9   Q.   Okay.
10   A.   I think I did, and maybe it was in the financial affidavit.
11   I don't know.  I put here what I had, so...
12   Q.   Okay.
13   A.   Maybe it's in the affidavit.
14   Q.   But it doesn't delineate that those are your separate
15   accounts and that they should be possessed only by you?
16   A.   Yeah.  I always had my own accounts, so I think the point
17   here was to say Olympia has always had her own accounts, and
18   they continue to be her own accounts, you know?
19   Q.   Okay.  I'm going to go back to paragraph 16.1.
20        Do you see where it says primary residence?
21   A.   Yes.
22   Q.   Okay.  I'm going to scroll over because it continues onto
23   page 10.  And it says here that both serve as co-settlors of
24   the trust that we discussed previously and that the husband is
25   going to commit to resign as co-settlor.
```

1        Do you see that?

2   A.   I see that.

3   Q.   Who decided that the defendant should resign as co-settlor

4   of that trust?

5   A.   So I think here, Amy and I were trying to figure out -- I

6   asked Amy, I am paying for all the bills of the house.  It's

7   for the benefit of the children, so I --

8   Q.   Sorry.  Can I interrupt you?

9        Who's Amy?

10  A.   Oh, my attorney, Amy Steele Donner.  Sorry, my divorce

11  attorney.  Sorry.

12  Q.   Okay.

13  A.   So it was a discussion that I had with my attorney, Amy

14  Steele Donner, about the fact that I was living in 597; I was

15  paying all the bills; the Trust was in the benefit of the

16  children, you know, and that Gustavo was a -- you know, going

17  to go serve time, and that he wouldn't be able to be trustee

18  anymore, or settlor, I guess, and so, you know, he should

19  resign because how can you manage a property for the benefit of

20  your children with someone who's going to jail?

21  Q.   Okay.  Do you know when that -- was that decision made, for

22  him to resign, during the, sort of, discussions leading up to

23  the settlement?

24  A.   We put this in the agreement.

25  Q.   Okay.  And, so, in your opinion, is the defendant no longer

1   a settlor of the trust?

2   A.   So now I've learned that you cannot resign as settlor,

3   right, because once you -- I don't know.  I'm not an attorney.

4   I don't know how it works.  I don't know if you can ever resign

5   as a co-settlor.  I'm not sure.

6   Q.   Let me ask you this:  What did you understand you were

7   getting at that time in exchange for his resignation?

8   A.   All the bills of the house and continue to manage it in the

9   benefit of the children.

10  Q.   And in addition to the bills, were you also getting the

11  homestead?

12  A.   It's for the children, so -- I mean, to me, this house is

13  my kids'; it's not mine.  I don't know how the legal piece of

14  it works.

15  Q.   But the house was the trust -- was in the trust.  The

16  property -- the real property was in the trust; is that

17  accurate?

18  A.   Correct.

19  Q.   And did he officially resign or attempt to resign?

20  A.   Of what?

21  Q.   As co-settlor, sorry.  As per your agreement.

22  A.   I don't know if he can.  I don't know.

23  Q.   So --

24  A.   I know he's resigned as trustee, co-trustee.  I don't know

25  if he's -- I know -- I don't know.

1    Q.   So was there -- there was no memorialization, then, of,

2    sort of, that he resigned?

3    A.   I signed the document with a real estate attorney, and

4    obviously here he's agreed that he does not have responsibility

5    to the house.  And this is the final agreement, so I think that

6    if I need to change that agreement, I would use this agreement,

7    right?

8    Q.   Okay.  All right.  I'm going to switch and share with you

9    what is government exhibit 7.  Okay?

10   A.   Mmm-hmm.

11   Q.   Can you see government exhibit 7?

12   A.   Yes.

13   Q.   Okay.  And do you recognize this document?

14   A.   I do.

15   Q.   What is it?

16   A.   It's the 597 Hibiscus Lane Revocable Trust that holds the

17   property for the benefit of the children.

18   Q.   Okay.  And is this the same trust that was referenced in

19   the MSA that we just discussed?

20   A.   Exactly.

21   Q.   Okay.  I'm going to scroll to page 13.

22        Okay.  Do you see page 13 where it says who the co-grantors

23   are and the co-trustees are?

24   A.   Yes.

25   Q.   Who are the co-grantors?

1   A.   Gustavo and I.

2   Q.   Okay.  And I just want to ask a clarification:

3        What is the difference, if you know, between a grantor,

4   which is the term that is used in this trust document, and a

5   settlor, which is the term used in the MSA, if you know the

6   difference or if you consider them to be, sort of,

7   interchangeable?

8   A.   I don't know.  I'm not the person to answer this question.

9   Q.   Okay.  And who are the co-trustees?

10  A.   Gustavo and I.

11  Q.   I'm going to switch out of exhibit 7, and I'm going to go

12  to government exhibit 8, real quick.

13       Do you see government exhibit 8?

14  A.   Yes.

15  Q.   Do you recognize this document?

16  A.   I mean, I don't remember it, but I know I have it.

17  Q.   What is the document?

18  A.   This is Gustavo resigning as co-trustee for the revocable

19  trust.

20  Q.   Okay.  And what is the date of that resignation?

21  A.   October, 2019.

22  Q.   And why did the defendant resign as co-trustee at that

23  time?

24  A.   Because I was asking him to during the MSA.

25  Q.   And so who is the current trustee of 597?

1   A.   I am.

2   Q.   I'm going to go back to government exhibit 7, so just give

3   me a second.

4        Do you see government exhibit 7?

5   A.   Yes.

6   Q.   I'm going to go to Article 2.1.

7   A.   Okay.

8   Q.   Who are the beneficiaries of this trust?

9   A.   So it reads here that it's Gustavo and I; contingent

10  beneficiaries are our children.

11  Q.   And who is the current beneficiary?

12  A.   I mean, to me, it's Gustavo and I; then, the children.  I

13  mean, to me, it's the children, but this is how it reads, that

14  it's us and then the children.

15  Q.   So is the defendant still a beneficiary of the trust, even

16  though he resigned as trustee?

17  A.   He is.

18  Q.   Okay.  All right.  I'm going to scroll to Article 4.

19       Do you see Article 4, where it says revocability?

20  A.   I see it.

21  Q.   What is your understanding as to who has the power to

22  revoke the Trust now?

23       Oh, I'm sorry.  Do you want me to blow that up?

24  A.   No, no, no; I can read it.  I'm just trying to understand

25  it, so I'm reading it a few times.

1    Q.   Okay.

2    A.   It looks like the grantor, which is, I guess, both Gustavo

3    and I, have the power to revoke it.  I guess that's the

4    definition of a revocable trust, right?  That's the point.

5    Q.   Okay.  So because he never officially resigned as

6    co-settlor, it's still the both of you?  Or co-grantor, I

7    guess.

8    A.   Yeah.  I don't think he can, and I think that -- I don't

9    know.  Yeah, exactly.

10   Q.   Okay.  You mentioned previously that you resided at 3

11   Gramercy Park West in New York, you know, with the defendant,

12   prior to moving to Miami.

13   A.   Right.

14   Q.   I want to show you what is marked as government exhibit 9.

15   So just a -- if you can bear with me a second, I'm having

16   technical difficulties.

17   A.   No problem.

18   Q.   Do you see government exhibit 9?

19   A.   Yes, I do.

20   Q.   Have you ever seen this document before?  I know it's a

21   little fuzzy and hard to read, but...

22   A.   Yeah, I think I saw that you guys had produced it recently.

23   Q.   Okay.

24   A.   But I'm -- mmm-hmm.

25   Q.   Yeah.  This is -- if you look at -- if we're going to look

1    at page 1 of this document here -- I'm going to go through it

2    sort of slowly so you can see it.  It says second floor unit at

3    3 Gramercy Park West is the unit.  You can sort of see, this

4    shall confirm our agreement as follows.

5    A.   Mmm-hmm.

6    Q.   Okay.  And if you look towards the sub -- sub romanette

7    one, where it says the LLC shall be formed by me, wholly owned

8    by me and/or my family --

9    A.   Mmm-hmm.

10   Q.   -- and that was the right to the unit.  I'm going to scroll

11   to page 2.

12       Who is that letter from and who is it agreed to by?

13   A.   So it's from Gustavo and agreed to by Bowman Cutter and

14   Abbie Cutter, who are residents and owners of apartments in the

15   building, 3 Gramercy Park West.

16   Q.   Okay.  I'm going to scroll back up to the top of this.

17       And what is the date of this agreement?

18   A.   July 22, 2005.

19   Q.   Okay.  I think you've already said that this was purchased

20   by Gustavo's family's trust; is that accurate?

21   A.   Correct, through the LLC.

22   Q.   So do you know what H.H.S. Master Settlement Trust is?  Is

23   that the family trust?

24   A.   Correct.

25   Q.   Okay.  And how do you know about H.H.S. Master Trust?

```
 1   A.   Because the family has shared that with me.

 2   Q.   Okay.  What role do you have with H.H.S. Master Trust?

 3   A.   None.

 4   Q.   Do you know what role the defendant has with H.H.S. Master

 5   Trust?

 6   A.   I know that he was not a beneficiary or a trustee.

 7   Q.   Was he a protector?

 8   A.   I think, at one point, yes.

 9   Q.   Do you know if he's still involved with H.H.S. Master

10   Trust?

11   A.   I'm not sure it exists anymore.

12   Q.   All right.  I'll show you government exhibit 10.  Bear with

13   me.  You should be seeing government exhibit 10.

14   A.   I am.

15   Q.   So looking at this first page, have you seen this document

16   before?

17   A.   No.  Since you guys have produced it, I've seen it.  I

18   mean, I know of it, but I haven't reviewed it.

19   Q.   Okay.  What is this document?

20   A.   I guess this is the amended restated H.H. Master

21   Settlement, declaration of trust, so --

22   Q.   And what is that --

23   A.   Mmm-hmm.

24   Q.   What is the date of the original settlement, if you look at

25   the very first paragraph there?
```

1    A.   November, 2006.

2    Q.   Actually, go down, I think, a little bit, past the --

3    A.   Sorry.  December 1, 2000 -- oh, I can't see past 1.2, the

4    Trust.

5    Q.   Is that --

6    A.   Now I can see -- I still -- I see now 1.2.1.

7    Q.   Oh, I'm sorry.  So go back up just a little -- not at 1.2.

8    I'm sorry.  Go above that to where it says this declaration of

9    trust.  Read the introductory paragraph.

10   A.   Okay.

11   Q.   And the date -- is the date of the H.H. Master Settlement

12   December 1, 2004?

13   A.   Yes, correct, December 1, 2004.

14   Q.   And go back to the very first line.  The date of the

15   amendment is?

16   A.   13th of November of 2006.

17   Q.   Okay.  And coming down to, sort of, the third sentence, the

18   property, what property is the trust receiving?

19   A.   I can't see that.

20        Oh, I see what you're saying.  The trustee declares that it

21   has received the property listed on the -- I've never seen this

22   document, so I don't know.

23   Q.   Okay.  So it's probably listed in Annex A.

24        I'm going to go ahead and forward to page 16 --

25   A.   Mmm-hmm.

```
 1   Q.   -- which is Annex A, and you can take a look at that.
 2        Can you see Annex A?
 3   A.   I see it.
 4   Q.   And if you look at -- what is the property listed in number
 5   three?
 6   A.   It's 100 percent of the beneficial interest in the Gramercy
 7   Irrevocable Operating Trust.
 8   Q.   Okay.  I'm going to go back to page 2, paragraph 3.1.4.
 9        Do you see who the trustee is of this trust?
10   A.   Americas Fiduciary Limited.
11   Q.   And where is that located?
12   A.   I'm guessing, Bahamas.  Nevis?  I'm sorry, I thought that
13   was a city in the Bahamas.
14   Q.   I'm going to go back to page 11.
15   A.   Cayman?  I don't know.  I'm sorry.
16   Q.   I don't know.
17        All right.  So page 11, 6.1.3, sorry.
18        Can you see where the protector for this trust is located?
19   A.   Yeah, the protector for the time being of the present trust
20   shall be H.H. Protectors Limited, a Bahamas corporation.
21   Q.   Okay.  I am going to bring up government exhibit 11 now --
22   A.   Mmm-hmm.
23   Q.   -- so bear with me.
24   A.   Mmm-hmm.
25   Q.   Do you see government exhibit 11?
```

1    A.    Okay.   Gramercy Irrevocable Operating Trust.

2    Q.    And is this the same -- it appears to be the same trust

3    that was incorporated as the property into the H.H. Master

4    Settlement Trust?

5    A.    I'm -- I'm not an expert on all this stuff.  If I -- I'm

6    answering things I don't know.

7    Q.    I can go back and pull that up, but that's what it appears

8    --

9    A.    Yeah, I can confirm what you're showing me, but I'm not an

10   attorney, and then I'm going to say something that I'm

11   interpreting as wrong.  I'll do my best, but it's not something

12   that I --

13   Q.    Have you ever seen this document before?

14   A.    No, only that you guys have produced it.

15   Q.    As I said, this is the Gramercy Irrevocable Operating

16   Trust.

17         What is the date of this document?

18   A.    July the 1st of 2005.

19   Q.    And I'm going to go forward to page 16.

20   A.    Mmm-hmm.

21   Q.    And what property does this trust own listed in number two?

22   A.    I think it owns a hundred percent of the membership

23   interest in 3 Gramercy Park West, LLC, which I know owned 3

24   Gramercy Park West (indiscernible).

25   Q.    All right.  I'm going to now attempt to pull up government

1   exhibit 12.

2       Do you see government exhibit 12 on your screen?

3   A.   Yes.

4   Q.   Have you ever seen this document before?

5   A.   I only see the top part, so I'm not sure what document it

6   is.

7       Okay, here we go.

8   Q.   Okay.  Do you know what this document is?

9   A.   Yeah.  So it's a dissolution of 3 Gramercy Park West.

10  Q.   And what does it say that 3 Gramercy Park West -- the

11  initial filing date, do you see that?

12  A.   Yeah, July 29, 2005.

13  Q.   And the name of the entity that was created was --

14  A.   3 Gramercy Park West, LLC.

15  Q.   Okay.  All right.  I'm going to go back to government

16  exhibit 9.

17  A.   Mmm-hmm.

18  Q.   Just a second.

19      Do you see government exhibit 9, again, on your screen?

20  A.   I do.

21  Q.   And what is the date on this document again?

22  A.   July 22, 2005.

23  Q.   And, again, what was the agreement between Gustavo and the

24  Cutters, if you look at number one, "you agree?"

25  A.   It says, you agree that I may assign my right to acquire

```
 1   the (indiscernible) interest in the unit, transfer title to the

 2   unit -- I can't really read everything.  And then it says, the

 3   LLC shall be -- I can't read it.

 4   Q.  To a domestic limited liability company.

 5   A.  Okay.

 6   Q.  Which would be created by the defendant.

 7   A.  Wholly owned by me or my family.

 8   Q.  Correct.

 9         THE COURT:  Do you have a claim for it, Mr. Hayden?

10         MR. HAYDEN:  Not right now, Your Honor.  I'm going to

11   turn back to government exhibit 12, Your Honor.

12   BY MR. HAYDEN:

13   Q.  Okay.  So going back to government exhibit 12, Ms. De

14   Castro, when did this company go inactive?

15   A.  I made this company go inactive, May 14, 2020.

16   Q.  I am now going to show you what's been marked as government

17   exhibit 13.

18         Do you see government exhibit 13 on your screen?

19   A.  I see it.

20   Q.  What is this?

21   A.  This is an authorization and designation of authorized

22   signatory of H.H. Protector for the master -- for H.H. Master

23   Settlement that designates me as an authorized signatory for 3

24   Gramercy Park, LLC, 29th of January, 2019.

25   Q.  Okay.  So you just said the date is January 29, 2019.
```

1      And who signed as the director of the H.H. Protector?

2   A.   Gustavo.

3   Q.   Why did the defendant give you signatory authority over 3

4   Gramercy Park West?

5   A.   So I was already a manager of 3 Gramercy Park West by 2019,

6   and I -- Gustavo was arrested in July of 2018.  He could not do

7   the functions there of manager, and so the family made me

8   manager so I could sign.  There was a settlement case that I

9   had to sign on behalf of -- as manager, and then I took over

10  the responsibilities of manager for 3 Gramercy Park West at

11  that point in time.

12      I think the purpose of this document was to -- the 3

13  Gramercy Park West was a tenancy in common, which means that

14  the owners had shares of the unit, and it was being converted

15  into a co-op, and the real estate attorney wanted Gustavo to --

16  I don't know -- sign this as -- so I could show that I was

17  authorized signatory.  I'm not sure why it was done this way.

18  Q.   And did you use the signatory authority?

19  A.   So -- not from this.  I used it from the beneficiary that

20  gave me signatory authority on 3 Gramercy Park West, LLC, back

21  in September of 2018.

22  Q.   I'm sorry.  I missed that.  What did you -- in September?

23  A.   Yes.  September of 2018, I became -- I became a manager of

24  3 Gramercy Park West, LLC.

25  Q.   And who made you a manager of 3 Gramercy Park, LLC?

```
1   A.   Maria Lucia Hernandez, who is the beneficiary of H.H.
2   Trust.
3   Q.   And what is her relationship to the defendant?
4   A.   Sister.
5        MR. HAYDEN:  Your Honor, I still have quite a few more
6   questions and some exhibits to go through, and I notice we're
7   getting close to 12:45, if not right on the dot.  It's
8   acceptable to the government to come back later today, or we
9   could always reset to a later date that's amenable to everyone.
10       THE COURT:  Ms. De Castro, what's your preference?
11       THE WITNESS:  I have to decide right now?
12       THE COURT:  Well, in other words, for example, if you
13  tell me that you've got something in the afternoon already set,
14  we don't have to do it this afternoon.  I'm just making it
15  available to you.
16       THE WITNESS:  Mmm-hmm.
17       THE COURT:  Otherwise, we can reset it.  Mr. Pasano,
18  suggested next week.  I know I have some availability next
19  week.
20       Do you have a preference?
21       THE WITNESS:  Can I check my calendar?
22       THE COURT:  Sure.
23       THE WITNESS:  I think I would prefer to finish today,
24  if possible.
25       THE COURT:  Okay.  Then why don't we do this, just for
```

```
 1    purposes of Ms. De Castro, not necessarily the other witnesses.
 2           So I know that, Mr. Pasano, you have other people that
 3    you may want to hear from.  So just for the purposes of
 4    finishing Ms. De Castro's testimony today -- is the court
 5    reporter available at 3:30?
 6           Yes, the court reporter is indicating she is.  So we'll
 7    come back at 3:30, just for Ms. De Castro, to finish up her
 8    testimony, so we'll get that in the can.  Okay?
 9           THE WITNESS:  Okay.
10           MR. PASANO:  Judge, this is Mr. Pasano.  Can I ask --
11    I'll move things around.  It's not a problem.
12           What time would we finish?  Because I actually have a
13    commitment to pick somebody up, but I can just move that as
14    long as I can tell them what time.
15           THE COURT:  Mr. Hayden, I can't imagine you would need
16    more than another hour, right?
17           MR. HAYDEN:  That's what I was just about to say, Your
18    Honor, just about an hour.
19           THE COURT:  So with any follow-up -- about five o'clock
20    at worst?  Okay.
21           MR. PASANO:  That sounds fine, Your Honor.
22           THE COURT:  Okay, great.  So that's what we'll do.
23    We'll adjourn and come back, same Zoom information, at 3:30.
24           MR. HAYDEN:  Thank you, Your Honor.
25           MR. PASANO:  Thank you very much.
```

```
 1              THE COURT:  Thank you.

 2              THE WITNESS:  Thank you.

 3              THE COURTROOM DEPUTY:  Court is now adjourned.

 4              (Court recessed at 12:47 p.m.)

 5              (Back on the record at 3:50 p.m.)

 6              THE COURT:  We'll go ahead and resume the hearing.  I

 7   apologize for the confusion.

 8              Go ahead, Mr. Hayden, with the particulars of your

 9   examination.

10              MR. HAYDEN:  Thank you, Your Honor.

11   BY MR. HAYDEN:

12   Q.  Ms. De Castro, can you hear me?

13   A.  I can hear you.

14   Q.  Did you speak with anybody at the break about your

15   testimony earlier?

16   A.  Just my attorneys.

17   Q.  So I just want to recap, real quickly, where we were prior

18   to the break and just set the scene for what we were talking

19   about.  The defendant created an LLC, 3 Gramercy Park West,

20   LLC, in July of 2005, and that bought the real property at 3

21   Gramercy Park West.  And that LLC was owned by a trust, the

22   Gramercy Irrevocable Operating Trust, which was also created in

23   2005, and then that trust was then placed into the H.H. Master

24   Settlement Trust, in 2006, on the amended.  Is that accurate?

25   A.  I don't know.  The dates, I don't know, for Gramercy
```

1    Irrevocable.

2    Q.   All right.  And, then, the defendant as director, though,

3    of H.H. Protector, which has the ultimate authority over that

4    master -- H.H. Master Settlement Trust, then gave you signatory

5    authority to transfer 3 Gramercy Park West to a co-op January,

6    2019, according to the -- exhibit 13 which we were looking at

7    just before we broke?

8    A.   So as I recall that exhibit, the signature there was

9    related to the co-op, yes.  I already had ability to sign for

10   that entity.  The documents I have was also that that attorney,

11   the real estate attorney, needed an EIN for that entity, so she

12   wanted assurance that that entity didn't have an EIN.

13   Q.   Okay.  And when did your signature authority end, as

14   granted by that document, from the defendant?

15   A.   Well, I mean, technically, I had signature power before,

16   and it remained after, but I guess that one was tied to this

17   real estate attorney needing specific things.

18   Q.   What else did you do with your signatory authority as the

19   Gramercy --

20       (Discussion was held off the record.)

21   BY MR. HAYDEN:

22   Q.   Ms. De Castro, I'm going to show you what is marked as

23   government exhibit 14 now.  Okay?  So bear with me while I pull

24   it up.

25   A.   Mmm-hmm.

1    Q.   Do you see government exhibit 14 on your screen?

2    A.   I do.

3    Q.   Okay.  And this document is a real property transfer tax

4    return filed with the New York City -- of finance.  And if I

5    scroll down here to the property location box, what is the date

6    located in there as the date of transfer to grantee?  Can you

7    see that?

8    A.   Yeah, yeah, I see that.  That's 12/28/2018.

9    Q.   Okay.  I'm going to scroll to page 5.

10        And is one of the grantors -- in the top box there, you see

11   it's 3 Gramercy Park West, LLC?

12   A.   Yes.

13   Q.   And, then, if you come down to the bottom of that box,

14   you'll see that it says single member's name, if grantor is a

15   single-member LLC, and that is Gramercy Irrevocable Trust.

16        Do you see that?

17   A.   I see that.

18   Q.   And that's the same as exhibit 11, that 3 Gramercy Park

19   West was held within (indiscernible) that trust.  And I'm going

20   to turn to page 17 of this document, scroll down.

21        And you see where it says 3 Gramercy Park West, LLC,

22   grantor or seller?  Is that your signature or initials?

23   A.   It is.

24   Q.   And do you know why you were given signature authority to

25   sign for this transfer after the date of the transfer?

85

1   A.   I had signature authority already before, from Maria Lucia,

2   and I signed because they were going through a co-op

3   conversion, as manager of the LLC.

4   Q.   Okay.  The date of this was December, 2018, and the date

5   the signature authority was granted was January of 2019.

6   A.   Yeah, but I had --

7   Q.   You're saying you already had the signature authority?

8   A.   Yeah, I think I produced those documents.

9   Q.   Okay.  I'm going to show you now what has been marked as

10  government exhibit 15.

11       MR. LUNKENHEIMER:  Do you need me to pull it up or --

12       MR. HAYDEN:  No, I think I have it.  Thank you.  I'll

13  try one more time here.

14  BY MR. HAYDEN:

15  Q.   Ms. De Castro, do you see government exhibit number 15 up

16  on your screen?

17  A.   Yes.

18  Q.   Again, this is a New York City Department of Finance real

19  property transfer tax return.

20  A.   Uh-huh.

21  Q.   And if you look at the grantor in the first box there, it's

22  3 Gramercy Park West, LLC, right?

23  A.   Mmm-hmm.

24  Q.   And if we scroll down just a little bit to the third box,

25  the property location, do you see the date of the transfer is

1    November 21, 2019?

2    A.   Yes.

3    Q.   Okay.  I'm going to go back up to the grantor box that says

4    at the bottom, the single member's name, if the grantor is a

5    single-member LLC, and that has been changed to D.C. 2019

6    Irrevocable Trust.

7         Do you see that?

8    A.   Yes.

9    Q.   How did 3 Gramercy Park West, LLC, ownership change from

10   GOIT, which was listed in exhibit 14, in the December 2018, to

11   this new trust now in November of 2019?

12   A.   So in the -- Gustavo's family, Maria Lucia Hernandez and

13   her husband, Carlos, approached me that they were unwinding the

14   H.H. Trust and distributing the assets, as was written by the

15   Trust, to the grandchildren of her father, and asked me to put

16   together an irrevocable trust to receive that asset for the

17   benefit of the children.

18   Q.   So why did they give you control of that property versus

19   the defendant?

20   A.   I was already the manager, but I don't have control of it

21   under D.C. Irrevocable Trust.

22   Q.   So the defendant didn't authorize that property to go to

23   you?

24   A.   I don't think it was in his capacity to do that.  I don't

25   know.

```
 1    Q.   What consideration did you give in exchange for ownership

 2    of that property?

 3    A.   My children.   It was gift -- it was contributed by Maria

 4    Lucia and her husband, so they contributed to an irrevocable

 5    trust in the benefit of the children.

 6    Q.   So it was a gift?

 7    A.   Yeah.

 8    Q.   What is your role with D.C. 2019 Irrevocable Trust?

 9    A.   So my attorney drafted that irrevocable trust as a grantor

10    trust, irrevocable grantor trust, so, I'm grantor.

11    Q.   When was it created?

12    A.   It was created in -- February 1st of 2019.

13    Q.   Okay.   So who are the settlors of the trust?

14    A.   The settlor is -- was that the trustee?   What does that

15    mean?

16    Q.   I think, who contributed the properties to the Trust or --

17    A.   So it was contributed by H.H. Trust.

18    Q.   So all the properties were contributed -- so was that the

19    sole property in the Trust, is the 3 Gramercy West property?

20    A.   So it was the Gramercy West property and cash also, later.

21    Q.   Cash from --

22    A.   From the sale of assets that they had.

23    Q.   From -- when you say "they," who do you mean?

24    A.   From H.H. Trust.

25    Q.   Who are the trustees --
```

```
 1   A.   For --

 2   Q.   -- D.C. 2019?

 3   A.   It's Allison Domeneghetti.

 4   Q.   Who is it?

 5   A.   Allison Domeneghetti.

 6   Q.   Just one trustee?

 7   A.   Yeah, just one trustee.

 8   Q.   And who are the beneficiaries of the trust?

 9   A.   My three children.

10   Q.   Are they contingent beneficiaries?

11   A.   No, they're the beneficiaries.

12   Q.   And what is your role with the trust again?

13   A.   I'm the grantor.

14   Q.   Does another trust or another entity own D.C. 2019

15   Irrevocable Trust?

16   A.   No, nobody owns it.

17   Q.   Okay.  I'm going to now show you what's been marked as

18   government -- oh, I'm sorry.  One more thing.

19        So you said that it was funded with the property and, then,

20   other assets that they sold.  Do you know what those other

21   assets were?

22   A.   I think they were paintings.

23   Q.   So when was that artwork acquired; do you know?

24   A.   No, I don't know.

25   Q.   Okay.  Where was that artwork prior to it being sold?
```

```
 1   A.   I don't know.

 2   Q.   Do you know who paid for that artwork?

 3   A.   I imagine, the H.H. Trust.

 4   Q.   And how much was the artwork valued at?  How much was

 5   deposited into the -- I guess, into the D.C. 2019 Irrevocable

 6   Trust?

 7   A.   Sure.  So it was a deposit of about $996,000.  Then, there

 8   was another deposit, I think, in the amount of $177,000.

 9   Q.   Do you know if the defendant received anything from the

10   winding up of the H.H. Master Settlement Trust?

11   A.   I don't know.

12   Q.   I want to go to exhibit 16 now.

13        Do you see government exhibit 16 on your screen, Ms. De

14   Castro?

15   A.   Yes, I do.

16   Q.   Okay.  I will scroll down to the bottom of it.

17        Do you see the date there?

18   A.   Yes.  It says November 18, 2019.

19   Q.   And, again, who is Allison Domeneghetti?

20   A.   She's the trustee of the irrevocable trust.

21   Q.   And what is your relationship with her again?

22   A.   So I've known Allison for many years.  I'm the Godmother to

23   her children.  She's the Godmother to my children.  She's a

24   professional businesswoman that I felt had the capacity to be

25   able to execute on a trust, so I asked her to be the trustee
```

1    for the irrevocable trust.

2    Q.   When is the last time you spoke with her?

3    A.   I speak to Allison often because she works for the family I

4    work for right now.

5    Q.   And how was she made the sole trustee?

6    A.   I made her, yeah.  I elected her.

7    Q.   Okay.  And going back to this document, it says here that

8    if the company is executing a residential contract sale, where

9    it says whereas, in the second paragraph there --

10   A.   Mmm-hmm.

11   Q.   -- the sale of -- you can go ahead and read it.

12   A.   I can read it.  Whereas the company has executed a

13   residential contract of sale dated September 13, 2019, for the

14   sale of the co-op unit, parlor unit 2, located 3 Gramercy Park

15   West, New York, New York.

16   Q.   And who -- who authorized the sale for Gramercy; is that --

17   A.   So, basically, I had made a recommendation that we should

18   rent the unit, since it was an investment property now owned by

19   the irrevocable trust, so that it could cover its bills and

20   hopefully pay for the children's education, generate some

21   income.

22        And, then, the folks that came to see the unit for rental

23   put an offer to purchase it.  The Trust declined the offer.

24   They increased the offer and, you know, the Trust decided to

25   sell because it was -- it was a family from England that was

1   probably overpaying for the unit.

2   Q.   How much did they pay for the unit?

3   A.   5.7 million.

4   Q.   5.7 million?

5   A.   Mmm-hmm.

6   Q.   What happened to the proceeds of that sale?

7   A.   It sat in the D.C. Irrevocable Trust, and then, later, it

8   was used for investment into another real estate property.

9   Q.   Okay.  I'm going to show you what is marked as government

10  17 -- exhibit 17 next.

11  A.   Mmm-hmm.

12  Q.   Do you see government exhibit 17 --

13  A.   I do.

14  Q.   -- on your screen?

15  A.   Yes.

16  Q.   Okay.  Do you recognize this as a New York City Department

17  of Finance, Office of City Register?

18  A.   Okay, yes.

19  Q.   At the top.  And, then, if we scroll down, sort of, in this

20  yellow box right at the top, it talks about the document type.

21  It talks about the date as 11/21/2019, and then the sale amount

22  of 5.7 million?

23  A.   Mmm-hmm, yes.

24  Q.   Is that accurate?

25  A.   That's accurate.

```
 1   Q.   Okay.  I'm going to show you what's now marked as

 2   government exhibit 18.

 3        Do you see government exhibit 18 on your screen?

 4   A.   I do.

 5   Q.   And do you see, again, that this is a New York City

 6   Department of Finance registered document, and it looks like

 7   it's the filing of a deed, on 7/2/2020, for 5.9 million?

 8   A.   Yes.

 9   Q.   And it's a sale of 314 Hicks, LLC, as a second party?

10   A.   I think the purchaser was 314 Hicks, LLC.

11   Q.   Yes, I think it -- where it says party two, do you see

12   that?

13   A.   Yes.

14   Q.   The name, and then the address; is that accurate?

15   A.   Yes.

16   Q.   I'm going to show you what's been marked as government

17   exhibit 19.

18        Do you see government exhibit 19 on your screen?

19   A.   Yes.

20   Q.   This is what they call an 8300 transcript right at the top.

21   A.   Mmm-hmm.

22   Q.   In the first box, it says the report was filed on July 8,

23   2020.  Do you see that?

24   A.   I do.

25   Q.   I'm going to scroll down here where it says persons
```

```
 1   involved in transactions.  Can you -- it says one of two.

 2   A.   Okay.

 3   Q.   Do you see the name of person one or entity one?

 4   A.   I do.

 5   Q.   Is that 314 Hicks, LLC?

 6   A.   Yes.

 7   Q.   Okay.  I'm going to scroll down to the next person involved

 8   in the transaction and that is Allison Domeneghetti.

 9        Do you see that?

10   A.   I see it.

11   Q.   And she is the trustee for the 2019 irrevocable trust, or

12   D.C. 2019?

13   A.   That's correct.

14   Q.   Okay.  And I'm going to go down to page 2, and I'm going to

15   look in amount and type of transaction box.  And do you see

16   where it says amount of cash received, in the second row down,

17   in that box, it says U.S. currency?

18   A.   Yes.

19   Q.   Do you see that it was a domestic wire from the 2019

20   irrevocable trust?

21   A.   Yes.

22   Q.   Is that accurate?

23   A.   Yes.

24   Q.   Okay.  And is that -- it says it was for the purchase of

25   314 Hicks; is that accurate?
```

 1    A.   Correct, that's accurate.

 2    Q.   Okay.  And did that cash come from the sale of three

 3    Gramercy?

 4    A.   Yes, it did.

 5    Q.   And, then, what's the total purchase price of 314 Hicks as

 6    listed in that box?

 7    A.   It's 5.9 million.

 8    Q.   Okay.  Where did the difference in funds come from?  It was

 9    approximately $500,000 difference.

10    A.   From the cash that was sitting -- the cash that was sitting

11    in D.C. Irrevocable Trust.

12    Q.   Okay.  What is Allison's involvement with 314 Hicks, LLC?

13    A.   She is the member, as trustee of D.C. Irrevocable Trust.

14    Q.   Okay.  And what is your role with 314 Hicks, LLC?

15    A.   I'm manager.

16    Q.   And why did -- I think you maybe mentioned this, but why

17    did D.C. 2019 Irrevocable Trust authorize the purchase of 314

18    Hicks?

19    A.   Because I proposed it as an investment asset to the Trust,

20    and they -- the buyers were -- went down more than 25 percent

21    in the value because of COVID, and it seemed like a good

22    investment opportunity, especially given the market volatility

23    that we were experiencing with the former administration.  It

24    would generate rental income.  And the Trust had already been

25    set up to hold property, and it seemed a good investment, I

1   think, so the trustee, I guess, agreed.

2   Q.   Are you currently renting 314 Hicks?

3   A.   Excuse me?  Yes, I am.

4   Q.   Are you renting it?

5   A.   It's being rented.

6   Q.   And what is the rental per month?

7   A.   It's about -- a little bit above 17,000.

8   Q.   Per month?

9   A.   Mmm-hmm, per month.

10  Q.   What assets remain in D.C. 2019 Irrevocable Trust?

11  A.   Cash.

12  Q.   Do you know approximately how much?

13  A.   I think, around four -- four something, 400 something.

14  Q.   400,000, roughly?

15  A.   400,000, yeah.

16  Q.   And is 314 Hicks, LLC, a part of D.C. 2019 Irrevocable

17  Trust?

18  A.   Yeah, 314 Hicks, LLC, is 99 percent owned by D.C. 2019

19  Irrevocable Trust, and then it's owned by -- 0.33 percent by

20  each of the children, so it's a partnership.  So it's

21  distribution to the children for 0.33 percent.

22  Q.   Okay.  I'm going to shift to IWM now and just ask you a

23  couple of questions about that.  I'm going to show you what's

24  previously been admitted as government exhibit 2, so bear with

25  me.

```
 1    A.   Mmm-hmm.

 2    Q.   Ms. De Castro, do you see government exhibit 2?

 3    A.   I do.

 4    Q.   I'm going to scroll down to page 8.

 5         So this is -- looks like the beginning of the chain of

 6    these emails between you and Mr. Holtz.  Can you see the date

 7    of that first email on your screen?

 8    A.   Yes, I see it.

 9    Q.   What is that date?

10    A.   It's July, 2019.

11    Q.   Okay.  And when was your -- when was the defendant

12    arrested?

13    A.   He was arrested in July of 2018.

14    Q.   And who is this email between?

15    A.   Daniel and I.

16    Q.   How do you know Mr. Holtz?

17    A.   I've known him for 20 years.

18    Q.   How do you -- business, socially?

19    A.   I mean, he -- yeah, he's a friend I've known for a very

20    long time.

21    Q.   How did you meet him?

22    A.   How did I meet Daniel?  I don't remember.

23    Q.   Okay.  Do you know -- you said a long time.  Ten years, 20

24    years?

25    A.   Like, 20.  I've known Danny for 20 years.
```

1    Q.   Why are you thanking him for the $25,000 here?

2    A.   Because I met with him in March of that year, and sat down

3    with him about the IWM ownership that was mine, and asked him

4    to pay me.  He made several excuses of why he couldn't pay it.

5    And I explained to him that I was the owner of IWM, and that he

6    should pay me, and he agreed in this meeting in March of 2019.

7         So I proposed that we formalize it because he said he was

8    getting a divorce.  And I said, you know, I've got -- you know,

9    you're -- splitting the assets with his wife.  And I said,

10   well, let's put it on paper that you owe me this money so

11   there's no question about it with your wife.

12        And so I gave him a promissory note for him to sign.  He

13   said he would review it.  And I said, you know, do you agree to

14   pay five percent simple interest?  So I'm not even compounding.

15   And he said, yes.  And so he said, I'll try to do it piecemeal.

16   And so he started paying me interest, and he would do it in

17   piecemeal.  So this 25 K was an interest payment that I

18   received on that date.

19   Q.   Okay.  So PN is promissory note; is that what that stands

20   for?

21   A.   Yeah.

22   Q.   And I think you said before that you got involved with IWM

23   in 2015; is that accurate?

24   A.   Correct.  I became --

25   Q.   As an owner?

1    A.   Yeah, that's right.

2    Q.   And I think you also said that it was the defendant's

3    investment in 2008 of 900,000 that -- into that partnership?

4         Who were the other partners in the -- in IWM?

5    A.   Sure.  So in 2008, which is a year after I married Gustavo,

6    Jorge Mora, Danny Holtz and Gustavo invested each 900,000

7    directly into Italian Wine Merchants.

8    Q.   Okay.  And, then, what is Salondera?

9    A.   So Salondera is an entity that was created in 2014 so that

10   I, Toni Holtz and Jorge's trust, which is under his daughter,

11   his daughter's trust, would receive the ownership of IWM.

12   Q.   Who is Toni Holtz?

13   A.   Danny's wife, or ex-wife.  I don't know the status.

14   Q.   I'm sorry.  I sort of -- can you go over it one more time

15   for me what -- why it was transferred to Salondera?

16   A.   So Danny Holtz, Jorge and Gustavo had been invited to

17   invest in another entity called Domaine, and that entity was a

18   wholesaler of wine, an importer.  IWM is a retailer in New

19   York, and prohibition laws, tied-house laws, prohibit that

20   ownership of the same party.  And so they had a legal opinion

21   that recommended that they transfer that interest to another

22   party, and Danny signed that acknowledgment, Gustavo and Jorge,

23   that they were transferring their interests in IWM to the other

24   parties that were the owners of Salondera.

25   Q.   So that that way they could -- they could continue to

1   operate IWM -- is it -- or, I guess, what, both investments?

2   A.  No, so that they could buy Domaine.  They weren't involved

3   in either --

4   Q.  Okay.

5   A.  We had a minority ownership.

6   Q.  So they had to divest themselves of that minority interest

7   in order to buy Domaine based on New York State liquor laws; is

8   that --

9   A.  Correct.  That's exactly it, yes.

10  Q.  Okay.  And did the defendant or anybody else have a role in

11  Salondera then?

12  A.  I mean, technically, no.  No, they shouldn't have, because

13  it's owned by me, Toni and Jorge's trust, Jorge's child's

14  trust.

15  Q.  So I'm going to scroll up to -- sorry.  I think we are --

16  I'll scroll up a little bit here in the exhibit.

17       So do you see this email?  It looks like you sort of go

18  back and forth with him for a couple of months.  It's September

19  now.

20  A.  Mmm-hmm.

21  Q.  You're still discussing, looks like, the promissory note

22  and the payments, and it looks like you sort of memorialize the

23  amount Walden paid.

24       What is Walden?

25  A.  Walden is a separate entity.  So he would pay out of Walden

1  or personal; he did both.

2  Q.  And is the money that was paid out for IWM paid from

3  Walden, and that's why the debt is owed to you, or -- could you

4  explain that?

5  A.  Sure.  So Walden -- so Salondera didn't have a bank

6  account, right?  So when it sold its interest back to the

7  original owners of IWM, Danny stepped up with Walden as escrow

8  agent for the sale.

9  Q.  Okay.  So Danny got what should have been Salondera's

10 share; is that what you're saying?

11 A.  Yeah, he said he could be -- he could serve as escrow

12 agent, so, technically, that should be off limits for him.

13 Q.  Okay.  So it's three years later, and you guys are trying

14 to formalize this debt that he owes you; is that what you're

15 saying?

16 A.  No.  So we sell in 2016, and then he holds the money in

17 escrow.  I did make efforts to collect, but I did it later.  I

18 was -- I had had two children -- three children, and I was

19 trying to build this business, and I trusted that Danny had

20 kept the money in the escrow account.  I never imagined that

21 Danny had spent the money.  Danny Holtz is a pretty significant

22 family here in Miami, and I would never imagine he would use

23 the proceeds of the account.

24 Q.  Okay.  And looking at -- you attached some files, it looks

25 like, to, you know, sort of establish your claim to Danny?

1    A.   Yeah.

2    Q.   The email exchanges -- and I'm looking through them.  It

3    looks like they're email exchanges between Mr. Holtz, Mr. Mora

4    and the defendant; Noero, his counsel.

5         If you go down to number six, there's email exchanges from

6    Mr. Holtz to the defendant in which Mr. Holtz confirms to the

7    defendant that he made use of the monies, it looks like, and he

8    needs time to repay those.

9         Where did you get those email exchanges from if you are not

10   on them?

11   A.   Sure.  I -- at this point, I was trying to put together the

12   facts so that I could prepare a lawsuit, in case I had to do

13   it, and I think in this case, if I was not specifically on it,

14   I may have had requested it from Gustavo.

15   Q.   Okay.  I think that's -- when is the last time you spoke to

16   the defendant?

17   A.   A while.  I mean, we -- logistics, you know, with the

18   children and everything, but we don't talk.  Right now,

19   especially, we're not speaking.  But I hadn't really spoken to

20   him before.  I mean, we talk in the kitchen and there's

21   children matters, but it's been at least two months we haven't

22   properly spoken.  And it's on and off.

23   Q.   You probably just answered this, but did you discuss your

24   testimony today in advance with the defendant?

25   A.   Absolutely not.

1          MR. HAYDEN:  I have no further questions, Your Honor.

2          THE COURT:  Okay.  Thank you.

3          Any follow-up questions, Mr. Pasano, or anybody else?

4          MR. PASANO:  Not from me, Your Honor; not at this time.

5   I will not bother Ms. De Castro.

6          THE COURT:  Okay.  Anybody else on here?

7          Hearing none, then I think questioning for Ms. De

8   Castro is complete for purposes of today.  Thank you very much

9   for your appearance --

10         THE WITNESS:  Thank you.

11         THE COURT:  -- and rescheduling for us.  Thank you very

12  much for your patience.

13         THE WITNESS:  Thank you, Your Honor.

14         THE COURT:  Okay.  In terms of the -- everybody else,

15  in terms of rescheduling this hearing for any other witnesses

16  that you all need, Mr. Lunkenheimer?

17         MR. LUNKENHEIMER:  Yes, Your Honor.  We would like to

18  still at least set on the calendar Ms. Domeneghetti's testimony

19  at a date -- I know there's a chance that we may talk to her in

20  the meantime and relieve the Court of having to take that

21  testimony, but I think it might be best to put it on the

22  calendar, since the sentencing of Mr. Hernandez is coming up in

23  March, and we want to continue moving forward and not let this

24  stall.

25         THE COURT:  When would you propose to do it?

```
 1          MR. LUNKENHEIMER:  Mr. Rabin, does your client have any

 2   conflicts coming up?

 3          MR. RABIN:  What I'm going to have to do is -- let's

 4   come up with a date.  In fact, I'll try while we're on the

 5   phone.  Tell me what date you're thinking of.

 6          MR. LUNKENHEIMER:  Your Honor, I -- the government is

 7   available, you know, the next -- I will make the time in the

 8   next -- you know, I don't think you have any time this week,

 9   but next week and the week after, we are available.

10          THE COURT:  Okay.

11          MR. PASANO:  The same is true for me, Your Honor.

12   Anytime next week, I can move around to accommodate the Court.

13          THE COURT:  Okay.  Well, why don't we do this:  I know

14   -- I believe Monday is -- is Monday a holiday?

15          MR. RABIN:  Yes, Monday is President's Day.

16          THE COURT:  Okay.  So right now, easy day for me to do

17   this would be Friday morning -- Friday morning, the 19th;

18   Friday morning, the 12th.

19          MR. PASANO:  To be safe, Your Honor, and give enough

20   time, could we do it the 19th?

21          MR. RABIN:  The 19th, I have a problem.  I have a

22   hearing at 10:30.  It probably will not last more than a half

23   hour to an hour, so we can start at 11:30.

24          THE COURT:  I also have the 18th, in the morning,

25   available.
```

```
 1              MR. RABIN:  18th, I've got something at 1:30, but I
 2    don't think it'll take that long, for sure.
 3              THE COURT:  The morning of the 18th, I'm free.
 4              MR. PASANO:  I can accommodate that, Your Honor, for
 5    Mr. --
 6              THE COURT:  Let's do that.  Let's pencil in the morning
 7    of the 18th at 9:30.  Okay.
 8              MR. LUNKENHEIMER:  Your Honor, did you say 9:30?
 9              THE COURT:  9:30 on the 18th.
10              MR. PASANO:  Your Honor, I trust that the adventure of
11    setting a Zoom hearing, we'll set a new one and get the notice?
12              THE COURT:  Yes.  We'll try again.  Okay.
13              MR. PASANO:  Yes, sir.
14              THE COURT:  Okay.  So at this point, then, we'll
15    adjourn pending our resumption on the morning of the 18th.
16              MR. PASANO:  Thank you very much, Your Honor.
17              THE COURT:  Okay.  Thank you all very much for your
18    attendance and cooperation.
19              MR. LUNKENHEIMER:  Thank you, Your Honor.
20              THE COURTROOM DEPUTY:  Court is now adjourned.
21              (Court recessed at 4:32 p.m.)
22                        C E R T I F I C A T E
23
24
25         I hereby certify that the foregoing is an
```

1    accurate transcription of the proceedings in the

2    above-entitled matter.

3            This hearing occurred during the COVID-19 pandemic

4    and is therefore subject to the technological limitations of

5    reporting remotely.

6

7

8    DATE:   February 16, 2021 /s/Ilona Lupowitz
                               ILONA LUPOWITZ, CRR, RPR, RMR
9                              Official Court Reporter
                               United States District Court
10                             400 North Miami Avenue, 8th Floor
                               Miami, Florida 33128
11                             (305) 523-5634

12

13

14

15

16

17

18

19

20

21

22

23

24

25